Tradesman Publishing Co. *v.* Car Wheel Co.

---

\* Tradesman Publishing Co. *v.* Car Wheel Co.

(*Knoxville.*    November 21,    1895.)

1. † Corporations.   *Insolvent, and assets become a fixed trust fund for creditors, when.*

   A corporation which has executed deeds of trust conveying its entire property, because of insufficient funds to meet the demands coming due, and has suspended business and turned its property over to the trustees, is insolvent so as to constitute its assets a fixed trust fund for *pro rata* distribution among its creditors, and invalidate the preferences made by such trust-deeds.   (*Post, pp. 642–648.*)

   Cases cited and approved: Marr *v.* Bank, 4 Cold., 471; Moseby *v.* Williamson, 5 Heis., 286; Comfort *v.* Patterson, 2 Lea, 672; Bank *v.* Lumber Co., 91 Tenn., 15; Smith *v.* Insurance Co., 2 Tenn. Chy., 737.   ·

2. Same.   *General creditor's bill lies to wind up, when.*

   A creditor, without first obtaining judgment on his demand, can, under our statutes, maintain a general creditor's bill to wind up the affairs of a corporation as insolvent, which had suspended business on account of its inability to meet its obligations as they fell due, and had, after such suspension, conveyed its entire property by trust-deeds, and turned same over to the trustees.   (*Post, pp. 648–650.*)

   Code construed: §§ 4168, 5037, 5038 (M. & V.); §§ 3431, 4294, 4295 (T. & S.).

   Case cited and approved: Smith *v.* Insurance Co., 6 Lea, 569.

3. Same.   *What constitutes an act of insolvency.*

   The conveyance by trust-deeds, of a corporation's entire property and surrender of possession thereof to the trustees, after its suspension on account of inability to meet its obligations as they fell due, constitutes an overt act of insolvency.   (*Post, p. 651.*)

---

\* This case is selected for report and annotation by the L. R. A.

† As to preferences among creditors given by insolvent corporations, see review of conflicting authorities in note to Lyons-Thomas Hardware Co. *v.* Perry Stove Co. (Texas), 22 L. R. A., 802.—Reporter.

Tradesman Publishing Co. *v.* Car Wheel Co.

4. SAME. *Director's liability who assents to indebtedness in excess of the " capital stock paid in." What is " capital stock paid in."*

The capital stock of a corporation, within a provision of its charter that if its indebtedness shall exceed the capital stock paid in, the directors assenting thereto shall be individually liable for such excess, is the amount subscribed and paid by the stockholders, and not the amount of all the assets upon hand available for payment of debts, no matter how derived. (*Post, pp. 651-657.*)

Cases cited and approved: Bank *v.* State, 9 Yer., 490; Street Railroad Co. *v.* Morrow, 87 Tenn.. 406; Insurance Co. *v.* Insurance Co., 11 Hum.. 1; Memphis *v.* Ensley, 6 Bax., 553; Gaslight Co. *v.* Nashville, 8 Lea, 406; 97 U. S., 697.

5. SAME. *Same. What constitutes indebtedness.*

The term "indebtedness" in a provision of the charter of a corporation declaring that if its indebtedness shall, at any time, exceed the capital stock paid in, the directors assenting thereto shall be individually liable for the excess, includes the bonded debt of the company. (*Post, pp. 657, 658.*)

Case cited: 113 U. S., 302.

6. SAME. *Same. Enforced by general creditor's bill.*

Where the liability of the directors of a corporation, under a statute for the excess of its indebtedness over the capital stock paid in, is a specific liability in favor of the creditors whose debts were illegally contracted, it is a fund for the benefit of all such creditors, and a bill to enforce it must be filed for the benefit of all creditors so situated, and not for one or more of them separately. (*Post, pp. 658, 659.*)

Cases cited and approved: Moulton *v.* Connell-Hall-McLester Co., 93 Tenn., 377; 93 U. S., 231; 20 Wall., 520.

7. SAME. *Same. What assent is required.*

The assent of a director rendering him liable, under a clause of the charter of a corporation that if its indebtedness shall exceed the capital stock paid in, the directors assenting thereto shall be individually liable to the creditors for the excess, must be given in his capacity as a director, acting concurrently with the authority of the official board at an official meeting, but the official minutes are not the only evidence of such assent. (*Post, pp. 660-663.*)

Cases cited and approved: Allison *v.* Coal Co., 87 Tenn., 62; Hand *v.* Cole, 88 Tenn., 402.

8. SAME.   *Statutes making directors liable strictly construed.*

Doctrine reaffirmed that statutes creating liability of directors for debts of corporations are in derogation of common law and penal in their nature, and are strictly construed.   (*Post, pp. 660-663.*

Cases cited and approved: Allison *v.* Coal Co., 87 Tenn., 62; Hand *v.* Cole, 88 Tenn., 402.

9. SAME.   *Directors' liability for dividends declared.*

That the indebtedness of a corporation exceeds its capital stock paid in at the time of the declaration of a dividend, will not render directors liable to creditors, under a provision of the charter that creates such liability for declaring and paying any dividend when the company is insolvent, or when such dividend will diminish the amount of the capital stock, when the dividend is declared from profits estimated upon the basis that the assets are reasonably worth, or honestly believed to be worth, largely more than the company's indebtedness. (*Post, pp. 663-665.*)

10. SAME.   *Same.*

The conduct of directors in declaring dividends is to be viewed, for the purpose of fixing their individual liability to creditors, in the light of the financial status of the company at the time the dividend is declared, and is not to be determined by its ultimate insolvency, due to a general paralysis of business. (*Post, p. 665.*)

11. LEASE.   *Purchaser not liable for rental.*

The purchaser of a lease of realty at judicial sale, made at the lessor's instance, for rents, is not liable for subsequently accruing contract rentals.   (*Post, pp. 666-668.*)

12. RECEIVER.   *Adoption of lease.*

Permission of a receiver for the temporary occupation of property leased to the corporation will not constitute an adoption of the lease by the receiver, so as to bind the assets in his hands.   (*Post, pp. 668-670.*)

Cases cited: 136 U. S., 223; 145 U. S., 636; 101 N. Y., 585.

13. SAME.   *Rents not payable as operating expenses.*

Rents accruing for property leased by a corporation from the appointment of a receiver of its property until confirmation of a sale of the leasehold, do not constitute a prior charge upon

the funds in the hands of the receiver, where he has not adopted the lease, on the ground that they are an operating expense. (*Post, pp. 668–671.*)

---

FROM KNOX.

---

Appeal from Chancery Court of Knox County. HENRY R. GIBSON, Ch.

L. A. GRATZ and TULLY R. CORNICK for Publishing Company.

LUCKY & SANFORD, COMFORT & SPILMAN, GREEN & SHIELDS, McCAMPBELL & JOHNSON for Creditors.

WEBB & McCLUNG and WASHBURN, PICKLE & TURNER for Directors.

McALISTER, J. This is a creditors' bill, filed, first, to have the Knoxville Car Wheel Company declared an insolvent corporation and its assets equally distributed among all its creditors; and, second, to hold the directors of said company, who are made defendants, individually liable for all debts created in excess of the capital stock paid in. The complainant also seeks to have annulled certain mortgages, for the reason, first, that they were executed by said corporation after its ascertained insolvency, and, second, because preferences are thereby created in favor of certain debts for which the directors are

sureties. The directors are also sought to be held liable, upon the ground that they had declared and received certain dividends from said corporation at a time when it was insolvent. It is alleged in the bill that, on. June 19, 1882, said car wheel company issued bonds to the amount of $100,000, and, to secure said bonds, executed a trust-deed on all of its real and. personal property to R. C. Jackson, as trustee, and that this trust-deed would mature July 1, 1892. It is then alleged that, on January 27, 1892, said corporation, being then insolvent, executed a trust-deed to R. S. Payne, trustee, conveying other real and personal property to secure the sum of $31,872.23 due the East Tennessee National Bank, the Mechanics' National Bank, the City National Bank, and Daniel Briscoe & Co. It is further alleged that, on January 27, 1892, said corporation, being insolvent, executed to L. H. Spillman, trustee, a deed of trust on other real and personal .property to secure the sum of $23,025.77 due to Knoxville Savings Bank, City National Bank, McNulty & Ransom, and Peter Staub. It is then charged that the last two deeds of trust were executed for the purpose of giving the creditors therein secured an illegal preference, and, having been made by an insolvent corporation, are fraudulent in law. There is no charge of fraud or bad faith. On the contrary, the bill recites, viz.: "Complainant expressly disclaims any reflection ⸰ upon the integrity and high character of the individuals who compose

the directors of said defendant, the Knoxville Car Wheel Company, or of the individuals and officers of the corporation who constitute its creditors of the preferred class, but the charge is that the effort to thus prefer one class of creditors of a corporation over others less favored and influential is illegal and void, and will not be tolerated by a Court of Equity."

It is next alleged that the capital stock of said company is $107,000, while its indebtedness amounts to $190,000 (less $10,000 paid by said Spillman, trustee), and that said directors assented to the creation of said indebtedness, and are therefore liable for the sum of $73,000, the excess of debts over the paid in capital stock; that it will · be necessary to sell all of the property of said company to pay debts, and, if that shall not suffice, then said directors are liable for the excess of the indebtedness above the capital stock. The bill asks the appointment of a receiver, the marshaling of assets, and the sale of the corporate property, and that the trust-deeds to Payne and Spillman be adjudged void. L. H. Spillman was appointed temporary receiver for the corporation.

The defendant car wheel company answered the bill, and, among other defenses, denied its insolvency, and averred that its assets were worth more than double its debts, and that its business had been uniformly profitable until the recent panic which swept over the country, causing the railroads to cut

off their purchases and to default in the payments of goods already purchased; that this fact so depleted its revenues that it was deemed best to temporarily suspend operations until business should resume its normal conditions; that it had always done a good business, and paid the interest on its bonded debt, and promptly met all of its obligations; that it was in no sense insolvent, and its suspension of business was only temporary, and was not intended to be permanent.

On May 23, 1892, the directors filed a joint demurrer and answer to the bill. The defenses are that they never assented to the creation of complainant's debt, and they further deny that the indebtedness of the company exceeds the capital stock in the sense of the statute, denying that the bonded debt of the company can be computed in ascertaining the liability of the directors under the statute, but that only the floating debt is to be considered. They further insist that the company has assets sufficient to pay all its bonded and floating debt, and to redeem all its stock.

On May 23, 1892, the Mechanics' National Bank, City National Bank, Knoxville Savings Bank, Daniel Briscoe & Co., beneficiaries under the trust-deeds aforesaid, filed their answers to the original bill, in which they deny the insolvency of the car wheel company, affirm the validity of the trust-deeds securing their debts, and resist the appointment of a receiver, and reserve the right to insist upon the

liability of the directors for their debts, if it should become necessary.

It appears that on June 6, 1892, upon motion of complainant, and upon the pleadings hereinbefore stated, the Chancellor declared the car wheel company an insolvent corporation, appointed L. H. Spillman permanent receiver, enjoined the company from exercising its corporate franchises, and assumed jurisdiction to wind up the affairs of said company as an insolvent corporation. A reference was ordered, to ascertain assets and debts. On July 20, 1893, the Clerk and Master filed his general report, showing, viz.: First, the assets of the car wheel company, on May 1, 1892, were $317,424.73; second, the secured debts, including bonds and the debts mentioned in the trust-deeds to R. S. Payne and L. H. Spillman, $162,100.51; third, the unsecured debts, $17,468.03. Total debts, $179,568.54. Complainants excepted to so much of the Clerk's report as fixed the assets of the company at $317,424.93.

On June 25, 1894, a decree was pronounced by the Chancellor adjudging the trust-deeds to Payne and Spillman void and that the directors were warranted in paying the dividends to stockholders and were not liable to the creditors of the company on that account. The Court reserved the question of liability of the directors upon the ground that the debts exceeded the assets, and referred the cause to the Master to report, first, the paid-up capital stock of the corporation; second, what debts were created

41—11 P

in excess of the capital stock with the assent of the directors. August 7, 1894, the Clerk reported, viz.: First, the paid-up capital stock of the car wheel company was $107,000; second, the indebtedness has exceeded the paid-up capital stock at all times since April 30, 1885, and that all the debts were created with the assent of the directors at a time when the indebtedness exceeded the paid-up capital stock, though there were assets sufficient to pay the debts. August 10, 1894, a decree was entered overruling the exceptions filed to this report by the directors, the Chancellor adjudging that the capital stock was $107,000, and that all debts created after April 30, 1885, were created at a time when the debts exceeded the capital stock, and were created with the assent of the directors.

The car wheel company and the directors, C. H. Brown, W. P. Washburn, W. W. Woodruff, D. A. Carpenter, and M. L. Ross, appealed, and have assigned errors. The defendant banks whose debts were preferred in the deeds of trust have brought the case up by writs of error, and assign errors upon the action of the Chancellor in adjudging their preferences illegal and in ordering said deeds to be set aside.

The second assignment is that the Chancellor erred in adjudging the car wheel company an insolvent corporation at the date of the execution of the second trust-deeds herein attacked, and in holding the latter void for that reason, and on account of

illegal preferences.    It is insisted that the car wheel company was solvent and a going concern, and it had the right to make preferential assignments to its creditors, and that said deeds of trust are therefore valid.

Mr. Morawetz, in his work on Private Corporations, referring to the cases which hold that corporate preferences are valid, says: "This doctrine, in the opinion of the writer, is wholly indefensible on principle.    The capital provided for the security of the creditors of a corporation is a fund held for the benefit of all the creditors equally.    That the unsecured creditors of a corporation are entitled to an equal distribution of the common security has often been recognized by the Courts of Equity in adjusting the rights of creditors among themselves and in relation to the company's shareholders.    After a corporation has become insolvent, and has ceased to carry on business, the rights of its creditors become fixed.    If a corporation, whose assets are not sufficient to satisfy all of its creditors in full, can prefer certain creditors, leaving others unpaid, this must be by virtue of a power reserved by implication to the company and its agents.    But this power cannot justly be included in the general powers of management which a corporation must necessarily possess over its property in order to carry on its business and further the purposes for which the company was formed.    The purposes of a corporation are not furthered in any manner by giving

it or its agents the power, after the company has become insolvent, and · has ceased to carry on business, and after the shareholders have lost their interests in the corporate estate, to prefer a portion of the creditors, according to interest or mere whim, and to pay their claims in full, leaving the others wholly without redress." 2 Morawetz on Cor., Sec. 803.

The settled law of this State is that the assets of an insolvent corporation become, from the date of its assured insolvency, a fixed trust fund for equal pro rata distribution among its creditors, unless otherwise provided by law or fixed by valid contract. *Marr* v. *Bank*, 4 Cold., 471; *Moseby* v. *Williamson*, 5 Heis., 286; *Comfort* v. *Patterson*, 2 Lea, 672; *Bank* v. *Lumber Co.*, 91 Tenn., 15; *Smith* v. *Insurance Co.*, 2 Tenn. Ch., 737. It has been held, however, in this State that, although the liabilities of a corporation may greatly exceed its assets, it is not insolvent in such sense as that its assets become a trust fund for pro rata distribution among it creditors, so long as it continues to be a going concern, and conducts its business in the ordinary way. There must be some positive act of insolvency, such as the filing of a bill to administer its assets, or the making of a general assignment, or the permanent cessation to do business. *Comfort* v. *McTeer*, 7 Lea, 660.

With this preliminary statement of the law, we proceed to inquire whether, at the date of the exe-

cution of the trust-deeds in question, to wit, on the twenty-seventh of January, 1892, the Knoxville Car Wheel Company was an insolvent corporation, and if this fact had been signalized by a suspension of its corporate business and the transfer of all its available assets.

The complainants took the deposition of Chas. H. Brown, the president, secretary, treasurer, and general manager of the corporation. It appears, from the testimony of Mr. Brown, that this corporation had lost money continuously since October, 1890. This witness further testified that, about January 30, 1892, the company suspended business. He was then asked: "Why did you suspend?" His answer was: "Because I did not have the money, outstanding notes went to protest, and bills became payable faster than we could make collections. The railroads were all in a cramped condition, and, instead of paying their bills at the first of the month, as they had done, they kept us waiting, and we are waiting for some of them yet." The witness was then asked if the deeds of trust were executed for the purpose of giving preferences. He answered: "I believe it to be construed that way." Question: "Did you, before suspending, consult with the directors as to the advisability of suspending?" Answer: "Yes, sir; I called the directors together, explained the financial situation, that notes were coming due and no funds to meet them, and the East Tennessee National Bank had refused to let us have any more

money. We then decided to assign, or, at least, to execute trust-deeds. The trust-deeds were not executed until after the company suspended.'' Witness states his impression, without giving actual figures, that the company had sufficient assets to cover the liabilities left unsecured after the execution of the deeds of trust. He is asked to specify any assets reserved by the company to pay the unsecured debts. The witness is unable to mention any item, but says, ''the only way to find out would be to take the deeds of trust and the balance sheet and check them off.'' When the balance sheet is checked off, it is ascertained that the principal items not contained in the deeds of trust are the items of account due from the Georgia Railroad Company and the Ducktown Sulphur, Copper & Iron Company, and which had been transferred by authority of the directors, January 25, 1892, to the Mechanics' National Bank, and the item of account against the Richmond Locomotive & Machine Works, transferred to W. R. Turner, to secure the payment of a note in favor of William Fain, administrator, which was then past due.

The record discloses that in these deeds of trust the company had conveyed its entire plant, including the wheels on hand and those in process of manufacture, its tools, stock in trade, all accounts and bills receivable, and lands owned by the company which were not then under mortgage. The property conveyed in the deeds of trust apparently em-

braced everything owned by the corporation. The trustees were placed in possession of the property conveyed to them, and the business of the company was suspended.

It further appears that, during the year ending April 30, 1891, the company had sustained a net loss of $12,831.04, and during nine months from April 30, 1891, to February 1, 1892, it had sustained a net loss of $20,987.83, making a total loss sustained by the company during the twenty-one months preceding the suspension of business on January 30, 1892, of $33,818.87. On the latter date the directors ordered the factory to be closed, stopped all salaries, except the salary of a bookkeeper, which was to be continued only until such time when the books were written up. The president of the company was requested to remain in charge during the month of February, the salary to be arranged hereafter, and he was authorized to reopen the machine shop, and to complete such unfinished work as was on hand, and also empowering him to sell the Carter County property, which was all covered by the trust-deeds made to Jackson and Payne. On March 30, 1892, the directors authorized the execution of an additional deed of trust to secure payment of claim of Jennifer Iron Company for $1,080.

It further appears that no meetings of the directors were held from March 30, 1892, to May 10, 1892, when the present bill was filed. During

this time no preparations were made for the resumption of business, but there was every indication of permanent suspension and a final liquidation of the affairs of the company.

The claim of the company that it was solvent, is, in our opinion, based largely upon extravagant valuations of its assets, and especially upon an overestimate of the value of certain lands owned by the company in Carter County. The valuation put upon this land by the stockholders was entirely arbitrary, and without any sufficient reason to justify such an exaggerated figure. The evidence shows that there was no market for such real estate in 1892; that, on account of the general depression in business, it was impossible to sell real estate, and that such an asset was entirely unavailable. When this bill was filed, the company's matured and unsettled floating indebtedness exceeded $70,000; its bonded indebtedness of $100,000 would mature in two months; the entire assets of the company were covered with deeds of trust, and the company was entirely without resources to liquidate this heavy indebtedness.

The question, then, is whether a creditor, on May 10, 1892, after the trust-deeds had been executed and the assignees had taken possession of the entire property of the company, could file and maintain a bill to wind up the affairs of the company as an insolvent corporation. We think the right to maintain the bill is clear and unquestionable.

Complainant, without obtaining a judgment at law

upon its demand, had the undoubted right to file this bill and have the company wound up as an insolvent corporation, and its assets distributed ratably among all the creditors. As stated in the brief, "while this bill was originally filed only to collect a debt of $400, there are now before the Court $190,000 of creditors, on whose behalf it was also filed, and who now join with the original complainant in the demand that it be sustained, and the assets of this insolvent corporation applied to the payment of its just debts."

The bill is clearly maintainable under the following sections of the (M. & V.) Code:

"5037. The creditors of a corporation may also, without first having obtained a judgment at law, file a bill in the Court of Chancery, to attach the property of the corporation, and subject the same, by sale or otherwise, to the satisfaction of their debt, when the corporate franchises are not used, or have been granted to others in whole or in part."

"5038. In such cases the Court may appoint a receiver, take an account of the affairs of the corporation, and apply the property and effects to the payment of debts *pro rata*, and divide the surplus, if any, among the stockholders."

"4168. A corporation is not dissolved by the nonuse or assignment to others, in whole or in part, of its powers, franchises, and privileges, unless all the corporate property has been appropriated to the payment of its debts; and any creditor, for himself

and other creditors, whether he has recovered judgment or not, or any stockholder, for himself and other stockholders, may file a bill, under the provisions of this chapter, to attach the corporate property, and have such property applied to the payment of the debts of the corporation, and any surplus divided among the stockholders."

In *Smith* v. *Insurance Co.*, 6 Lea, 569, it was said that, under these sections of the Code, "the Court may find [as] a fact that the corporation is insolvent, or has ceased to do business, or has granted its franchises, in whole or in part, to others, and, upon the adjudication of any of these facts, the right to administer its effects for the benefit of creditors follows."

We are also of the opinion that the execution of these deeds of trust, under the circumstances, was an overt act of insolvency, and was a preferential diversion of the corporate assets to the payment of debts of one class to the exclusion of other classes. The execution of the deeds of trust, under the circumstances, was a confession of insolvency. We therefore adjudge the several deeds of trust executed by the car wheel company to Payne, Spillman, and McMillan void, and the decree of the Chancellor in setting them aside was correct.

We do not decide, and do not wish to be so understood, that a corporation, although actually insolvent, so long as it is a going concern, may not deal with its property and transfer it for value, in

due course of business, to general creditors. A mere excess of liabilities over assets would not alone be sufficient to justify an interference and stoppage of business at the suit of a creditor. "A corporation is authorized to continue the management of its affairs, to deal with its property, and to assign it for value in due course of business, notwithstanding its actual insolvency, so long as there is an honest intention and a reasonable expectation on the part of the company of redeeming its fortunes; and it is only when a corporation is about to defraud its creditors by waste of its assets, or when the insolvency of the company is hopeless, so that further prosecution of the enterprise would clearly be at the expense of the creditors, that the latter may interfere to protect their lien." 2 Mor. Cor., Sec. 786 (2d Ed.); Wait on Ins. Cor., Sec. 34, quoting the above with approval; Spelling on Cor., Vol. II., Sec. 712. "It has accordingly been held that a corporation which is insolvent and unable to pay all of its creditors in full may continue its operations, and pay off debts in regular course of business, though a part of the creditors be thereby deprived of their security." 2 Morawetz on Cor., p. 786.

We hold, however, that this corporation, at the date of the filing of the bill, was not only actually insolvent, but had committed an overt act of insolvency by preferential assignments to creditors.

The next question presented is in respect of the

individual liability of the directors.    The charter of the Knoxville Car Wheel Company contains the following clause, to wit:   "If the indebtedness of said company shall at any time exceed the capital stock paid in, the directors assenting thereto shall be individually liable to the creditors for said excess." The Chancellor found that the capital stock of the company subscribed and paid in amounted to $107,-000, and that all debts created after April 30, 1885, were in excess of the capital stock paid in; that the directors had assented to the creation of such indebtedness, and were individually liable.    He decreed, however, that this liability upon the part of the directors was secondary, and that the sum could not be ascertained until the property of the corporation was sold and its proceeds distributed.    The finding of the Chancellor that the capital stock of the company was $107,000, is fully sustained by the record.    The capital stock is shown by the first report made by the secretary and treasurer of the company to stockholders, on May 19, 1882, to be $107,000, and it appears at the same sum in every subsequent annual report from that time to February 1, 1892, upon which date the last report was made.    The capital stock is proven to have been $107,000 by C. H. Brown, who was secretary and treasurer or president of the corporation from its organization.

It is insisted in behalf of complainants that the excess of indebtedness over capital stock for which

the directors are liable amounts to the sum of $73,-000. It is conceded by defendants that if the term indebtedness employed in the statute should be held to embrace the fixed bonded indebtedness of the company, as well as its floating debts, then its indebtedness does exceed the capital stock paid in. The insistence in behalf of the directors on this branch of the case is twofold, to wit: First, that the term, capital stock paid in, includes not merely the capital stock paid in by the subscribers, but the entire capital and available assets of the company; second, that the term, indebtedness, used in the statute, does not include the bonded indebtedness, but merely the floating debts of the company. The proper solution of this question involves the determination of the correct meaning of the terms, "indebtedness" and "capital stock paid in," as employed in the charter of the company. What, then, is the meaning, in this connection, of the term "capital stock paid in?"

The insistence of defendants' counsel is that the assets on hand and available for payment of debts, no matter how derived, must constitute the fund called "capital stock paid in." In support of this contention, counsel cites Beach on Corporations, Vol. II., Sec. 465, viz.: "In respect to corporate capital, the word 'capital' is, in general, used in signifying the sum paid in by the subscribers, with the addition of all gains and profits realized, with such diminutions as have resulted from losses incurred

in transacting business. In this sense, the capital of a corporation is the fund with which it transacts its business, and embraces all its property, real and personal, constituting the assets of the corporation, such as are subject to execution at law. So much of the capital as is represented by the capital stock issued must be kept unimpaired during the existence of the corporation; but that portion of the capital which represents the surplus arising from the operation of business of the corporation is subject to the discretion of the managers in regard to its disposition. Therefore, profits remain a part of the fund constituting the capital until actually divided among the stockholders.''

We do not think the quotation from Beach sustains the position. It will be observed that Mr. Beach, in this quotation, is dealing with the word ''capital,'' and he does not treat this term as synonymous with ''capital stock.'' In the very next section the same author says, viz.: ''There is a distinction between the capital of a corporation and its capital stock, though they are often used as interchangeable terms.''

The capital stock is clearly not the same as property possessed by the corporation, for the capital stock remains fixed, although the actual property of the corporation varies in value, and is constantly increasing or diminishing in amount. What the amount of the capital shall be is in the discretion of the managers, but the amount of the capital stock

is limited, and determined by the charter and the
laws governing it.    It follows, therefore, that the
limit imposed upon the capital stock of the corpo-
ration does not restrict the amount of property
which it may own.    (Beach on Private Corporations,
Vol. II., Sec. 466.)    This distinction is clearly shown
in Section 791 of Morawetz on Corporations, in these
words:    "The amount of the capital stock of a cor-
poration is usually fixed at a definite sum by the
charter, or other instrument, which has been agreed
to by the shareholders, as containing the essential
conditions of their association.    It is so fixed, partly
for the purpose of determining the scope of the
company's business and the relative rights and obli-
gations of its shareholders as among themselves, and
partly, also, for the purpose of obtaining commer-
cial credit on behalf of the corporation by indicating
to it what security has been provided with those who
deal with it.    Every person who becomes a share-
holder in a corporation, and every person who deals
with a corporation, understands that the fund con-
tributed, or agreed to be contributed, as the com-
pany's capital shall be charged with the payment of
corporate debts.    It is likewise understood, where
there is no express provision to the contrary, that
the funds so charged shall be the only security for
creditors, and that the shareholders shall not be in-
dividually liable for the corporate debts and obli-
gations.    Every contract entered into by the corpo-
ration, therefore, includes (1) an implied agreement

that the company's capital shall be held and used
as a trust fund, equitably pledged as security for
the corporate debts; (2) an implied representation
that the company's capital has been paid in, or
subscribed, as indicated by the company's charter,
and that the fund contributed, or subscribed, has
been preserved for the purposes for which it was
provided." "Capital stock is the sum fixed by the
corporate charter as the amount paid in, or to be
paid in, by the stockholders, for the prosecution of
the business of the corporation, and for the benefit
of corporate creditors. The capital stock is to be
clearly distinguished from the amount of property
possessed by the corporation. Occasionally it happens
that, under the terms of statutes relating to 'tax-
ation' which have been drawn without regard to
the technical meaning of words, the Courts will con-
strue the capital stock to mean 'all the actual prop-
erty of the corporation.' But this is for the pur-
pose of carrying out the intent of the statute, and
is not the real meaning of the term. At common
law the actual stock does not vary, but remains
fixed, although the actual property of the corpora-
tion may fluctuate widely in value, and may be di-
minished by losses or increased by gains." Cook on
Stockholders, Vol. I., Sec. 9. See, also, *Railroad*
v. *Gaines*, 97 U. S., 697; *Ohio Life Insurance Co.*
v. *Merchants' Insurance Co.*, 11 Hum., 1; *Union
Bank* v. *State*, 9 Yer., 490; *Street Railroad Co.*
v. *Morrow*, 87 Tenn., 406; *Memphis* v. *Ensley*, 6

Bax., 553; *Gaslight Co.* v. *Nashville,* 8 Lea, 406. We therefore conclude that the term "capital stock paid in" means the amount subscribed and paid by the stockholders, and that amount is clearly shown by the proof to have been $107,000.

The next question presented is whether the word indebtedness in the clause of the charter imposing personal liability on the directors assenting to an indebtedness in excess of the capital stock paid, includes bonded indebtedness. The Chancellor so held. The contention of the directors' counsel is that the term means the floating indebtedness, and does not embrace the bonded debt. Counsel, in order to support this contention, go into a history of previous legislation on this subject, but we have been unable to derive much light from that source. The only material difference we note between the former Acts and the statute in question is that, in the latter, the words "paid in" have been added. The former Acts simply provided that the indebtedness should not exceed the capital stock. We think the addition of the words "paid in" strengthens rather than diminishes the force of the argument that bonded indebtedness is within the meaning of the statute. The construction contended for by counsel for the directors would lead to this anomaly, that directors, having contracted indebtedness to the limit allowed by the charter, may fund this liability in bonds, secure them by a recorded mortgage, and then, without risk to themselves, incur additional

indebtedness, and repeat the process *toties quoties*. We have been furnished with no direct authority on the point now being adjudged. Counsel, however, cite *Stone* v. *Chisolm*, 113 U. S., 302, where it appears that the indebtedness with which the directors were sought to be charged under a North Carolina statute was a registered bonded indebtedness, but the precise point raised here was not presented or decided. We think this section of the charter of the car wheel company is unambiguous, and the term indebtedness clearly includes the bonded debt.

It is insisted by defendants' counsel that the directors' liability does not constitute a fund for the benefit of creditors generally, but that it is a specific liability in favor of individual creditors whose debts were illegally contracted, and that other creditors, whose debts were legally contracted, cannot avail themselves of it. That proposition is true; but, in conceding this, we do not wish to be understood as agreeing that each creditor whose debt has been illegally contracted may maintain a separate suit against the directors for the assertion of his individual claim. We held in *Moulton* v. *Connell-Hall-McLester Co.*, 93 Tenn., 377, that the liability of the directors is a fund created by the statute for the benefit of all the creditors whose debts were incurred in excess of the capital stock paid in with the assent of directors, and that the bill must be filed for the benefit of all creditors so situated. In this view, the present bill is properly framed.

*Horner* v. *Henning*, 93 U. S., 231; *Stone* v. *Chisolm*, 113 U. S., 302; *Pollard* v. *Bailey*, 20 Wall., 520. In *Stone* v. *Chrisholm*, 93 U. S., Justice Matthews, in stating the reason of the rule, said, viz.: "The conditions of the personal liability of the directors of the corporation, expressed in the statute, are that there shall be debts of the corporation in excess of the capital stock paid in, to which the directors sought to be charged shall have assented.     .     .     .     .     . To ascertain the extent of the liability in a given case requires an account to be taken of the amount of the corporate indebtedness, and of the amount of the capital stock actually paid in, facts which the directors, upon whom the liability is imposed, have a right to have determined once for all in a proceeding which shall include all who have an adverse interest and a right to participate in the benefit to result from enforcing the liability.     .     .     . The evident intention of the provision is that the liability shall be for the common benefit of all entitled to enforce it, according to their interest, an apportionment which, in case there cannot be satisfaction for all, can only be made in a single proceeding, to which all interested can be made parties. It is immaterial," continues the Court, "that, in the present case, it does not appear that there are other creditors than the plaintiff in error.. There can be but one rule for construing the section, whether the creditors be one or many."

The next assignment is that the Chancellor erred in decreeing that all the debts of the company contracted after April 30, 1885, were created with the assent of the directors. It may be conceded that this assignment presents a question of some difficulty, and probably the determining issue in the case. The language of the statute is, viz.: "If the indebtedness of said company shall at any time exceed the capital stock paid in, the directors assenting thereto shall be individually liable to the creditors for said excess." It may be remarked that this clausé is peculiar to charters of mining and manufacturing companies, and is a discrimination, to some extent, against this class of domestic corporations. It has been uniformly held that such statutes, being in derogation of the common law, must be strictly construed. As stated by Mr. Cook in his work on Stock, "they [such statutes] are a wide departure from established rules, and, though founded on considerations of public policy and general convenience, are not to be extended beyond the plain intent of the words of the statute." *Hand* v. *Cole*, 88 Tenn., 402, 403; 2 Spelling on Cor., Sec. 921; *Allison* v. *Coal Co.*, 87 Tenn., 62, 63.

Says Mr. Thompson, in his Commentaries on Private Corporations, Sec. 4271: "It is a principle of legal procedure that when a party sues to enforce a liability created by statute in derogation of the common law, he must not only dis-

tinctly aver, but he must make strict proof of a case within the terms of the statute. The principle operates, if possible, more strongly where, as in the case under consideration, the statute creates a liability in the nature of a penalty. The principle is believed to be a rule of right rather than a rule of procedure, and hence applicable in the equitable as well as the legal forum.'' Where the liability is imposed upon the directors assenting thereto, ''the creditor . . . must both allege and prove that the directors against whom he proceeds did assent to the unlawful contract.'' Thomp. Com. Private Cor., 4206.

Again, the same author, at Section 4264, says: '' On the other hand, where the liability . . . is for the excess, an interpretation has been fallen into which assimilates their liability to that of guarantors of final payment, which is believed to comport best with the real policy of all such statutes, by holding that the effect of the statute is to make the directors individually liable for such specific debts only as were contracted with their assent in excess of the paid-up capital, and which remained unpaid after the exhaustion of the corporate assets.'' Thomp. on Private Cor., Vol. III., Sec. 4264.

These principles have all been recognized and applied by this Court in the case of *Allison* v. *Coal Co.*, 87 Tenn., 62, 63. The liability of a director is contingent, and is made to depend upon four conditions, viz.: (1) Assent by him to the creation of

the particular debt upon which he is sued, (2) that the debt has not been paid, (3) that the assets of the corporation have been exhausted, (4) that the particular debt is in excess' of the capital stock. Judge Lurton, in delivering the opinion of this Court in *Allison* v. *Coal Co.*, said: "Unless the very debt upon which it is sought to hold the director to individual liability was created by the assent of the director, it is not the case provided for by the charter." The cardinal inquiry, then, upon this branch of the case is whether there is proof in this record of assent by the directors to the creation of the particular debts for which the directors are sought to be held individually liable under this statute. It is insisted by counsel for the directors that the assent contemplated by the statute must be given · by the directors, not as individuals, nor even as stockholders, but in their capacity as directors. We are constrained to believe, upon mature consideration, that this construction is the proper one to be given this statute. This construction accords with the general rule that directors must act as an official body. Mr. Cook, in his work on Stock, states the rule thus: "Moreover, the directors can contract and act only as a board duly notified and assembled. The members of the board cannot agree separately and outside of the meeting, and thereby bind the corporation. Nor can a minority of the body meet and bind the board. A majority must be present, and then a majority of that majority binds the corpora-

tion. A single director has no power to contract for the corporation." Cook on Stock and Stockholders, Vol. II., Sec. 712. So, we think, when it is sought to hold a director to individual liability under the provisions of this highly penal statute, it must be shown that his assent was given in his capacity as director acting concurrently with a majority of the official board. We do not hold that the only evidence of this official assent must be found in the minutes of the board, but we do hold there must have been an official meeting when assent was given, whether it appears in the minutes or otherwise. In other words, we hold the official minutes do not constitute the only evidence of official assent, provided it is made otherwise to appear that, at a meeting of the official body, the directors sought to be charged assented to the creation of the particular debt. Tested by this rule, we find, upon an examination of the record, that only one of the debts with which the directors are sought to be individually charged was officially assented to, viz.: that in favor of Peter Staub for lease of foundry.

It is next assigned as error that the Chancellor refused any relief against the directors on account of the payment of dividends, amounting to $28,000. It is contended by counsel that said dividends were paid at a time and under circumstances that rendered the payment unlawful, and was a diversion of the assets of the corporation. The charter of this company provides, viz.: "If the directors declare and

pay any dividend when the company is insolvent, or which declaration of a dividend would diminish the amount of the capital stock, they shall be jointly and severally liable to creditors for the amount of dividends thus declared. Any director may avoid liability by voting against the dividend, or by filing his objections, in writing, as soon as he ascertains a dividend has been made.''

The dividends in question were paid, viz.: April 30, 1884, four per cent., $4,280; April 30, 1886, four per cent., $4,280; April 30, 1887, four per cent., $4,280; April 30, 1888, four per cent., $4,-280; April 30, 1889, five per cent., $5,350; April 30, 1890, six per cent., $6,420. It is insisted that the first dividend, paid April 30, 1883, was paid out of the proceeds of the bonds which had been sold by the company at a discount of twenty-two per cent., and that the remaining dividends were paid at a time when the corporation was insolvent, and when its indebtedness exceeded the amount of its paid-up capital stock. The Chancellor, upon the hearing, was of opinion that the directors were warranted in the payment of these dividends, and that the defendants were not liable to the creditors of the corporation. It is true, as argued by counsel, that, when these dividends were declared, the indebtedness of the corporation did exceed the amount of capital stock paid in, but, under the statute last cited, this fact does not determine the liability of directors. The inhibition of the statute is against declar-

ing dividends when the company is insolvent or when such dividend will diminish the amount of the capital stock.    If the assets are reasonably worth, or are ι honestly believed to be worth, largely more than the company's indebtedness, and upon . this basis profits are estimated, the company is not insolvent, although its indebtedness may exceed its capital stock paid in. The record discloses that when these dividends· were declared, this company was engaged in a very extensive business, and was· realizing large receipts from the sale of the products of its manufacture. Its assets were estimated by its directors to be largely in excess of the company's liabilities, and the proof shows that said assets, which consisted largely of mineral lands, were largely more valuable then than at a later period.    The proof indicates that during the years covering the declaration of dividends the company was realizing a net profit on its business, and there was no reason why those profits should not have been distributed among its stockholders.    The conduct of the directors is to be viewed in the light of the financial status of the company at that period, and is not to be determined by its ultimate insolvency, precipitated, doubtless, by the universal paralysis of business then prevailing throughout the country.    When the large volume of business transacted by this company is considered, it is not perceived how its insolvency could have been superinduced by the small dividends declared.    We are of opinion there was no

error in the action of the Chancellor upon this branch of the case.

The next matter for consideration arises upon the answer and cross bill of Peter Staub. As a creditor of the car wheel company, Staub, on May 13, 1892, became a party to the original proceedings, and filed an answer, in which he admitted the material allegations of the bill. His answer was also filed as a cross bill, in which it was alleged that, on December 31, 1890, he leased to the car wheel company his foundry property on Hardee Street, in the city of Knoxville, for a term of five years, at a rental of four thousand ($4,000) dollars per annum, payable in monthly installments of $333.33.

It is then alleged that the company is indebted to him in the sum of fifteen hundred ($1,500) dollars, on account of accrued rents, which he seeks to recover, and also asks a decree for the rents for the unexpired term as the same mature.

It is further alleged that the directors of the company assented to the lease, and are individually liable to him, for the reason that, at the time this lease was contracted, the indebtedness of the company exceeded its paid-in capital stock. Complainant in the cross bill also joined in the prayer of the original bill for the appointment of a receiver.

It further appears that, on November 28, 1892, Staub filed a petition in said cause, stating that, by reason of nonuser, the foundry property was getting out of repair, and asking that proper repairs be

made by the receiver.    Petitioner further prayed that the leasehold be sold, alleging that the value of the lease was being deteriorated each day.

It further appears that, upon motion of counsel for Staub, the Chancellor allowed, as a preferred claim, all rents accrued and accruing upon the leasehold property from May 10, 1892, date of appointment of temporary receiver up to date of confirmation of sale of leasehold, which the receiver was ordered to pay out of any funds in his hands belonging to the company.    In accordance with the decree of the Chancellor, the unexpired term of the lease was sold by the Clerk and Master, and purchased by the Clark Foundry & Machine Company at the price of $4,500.    This amount not being sufficient to discharge balance of rent for the unexpired term, the Chancellor decreed that the company should be liable for the difference between the amount realized from the sale of the leasehold, and the sum contracted to be paid in the lease, and he accordingly pronounced a judgment against the company for this deficit, amounting to the sum of $3,600.

Two assignments of error are based upon the action of the Chancellor in his disposition of the matters presented in this lease.    The first is, that he erred in decreeing that the car wheel company was indebted to Peter Staub in the sum of $3,609 on account of the unexpired term of the lease; that this unexpired term had been sold to the Clark Foundry & Machine Company, and the purchaser be-

came onerated with the payment of the entire rental. We think the proposition embodied in this assignment that the purchaser, after buying the unexpired term of the lease at chancery sale, should, nevertheless, be charged with the contract rental of the original lease for balance of term, carries on its face its own refutation.

The second assignment is that the Court erred in holding that the rents accruing from the Staub lease, after the appointment of the receiver up to date of confirmation of sale of leasehold, constituted a first charge upon the funds and property in the receiver's hands, and ordering same paid, as an expense of the receivership. In support of this assignment, counsel for appellant argue that complainant, Staub, became a party to the original bill in this cause, by which the car wheel company was enjoined from prosecuting its business or using its leasehold property, and had a permanent receiver appointed and the leasehold sold. In a word, that the possession and holding of the leasehold estate from May 10, 1892, until it was sold and sale confirmed, was all done at the instance and for the benefit of Staub, the lessor. It is contended, however, by counsel for Staub that the receiver took possession of the property and proceeded to rent some of it to tenants. The evidence wholly fails to show any renting of the property by the receiver, nor is there any proof that the receiver has ever charged or received any rent for such occupation. At most, the record

shows that one or two persons were permitted to occupy a part of the premises temporarily. As suggested by counsel, for aught that appears in this record, "this temporary use may have been for the protection and preservation of the property." It is insisted by counsel that such temporary occupation of the property by permission of the receiver would not be an adoption of the lease by the receiver so as to bind the assets in his hands. Again, it is insisted that the receiver had no authority to adopt this lease, and, even if he had attempted to do so, it would not bind the complainant or the creditors. It is then suggested that complainant, Staub, in none of his pleadings, had ever claimed that the receiver was liable for the rents, or that he had adopted the lease. "A receiver derives his authority from the act of the Court appointing him, and not from the act of the parties at whose suggestion or by whose consent he is appointed, and the utmost effect of his appointment is to put the property, from that time, into his custody as an officer of the Court for the benefit of the parties ultimately proved to be entitled, but not to change the title or even right of possession in the property." *Union Bank of Chicago* v. *Kansas City Bank*, 136 U. S., 223.

As observed in another case, "the ordinary chancery receiver, such as we have in this case, is clothed with no estate in the property, but is a mere custodian of it for the Court, and, by special

authority, may become an officer of the Court to effect a sale of the property, if that be deemed necessary, for the benefit of the parties concerned. If the order of the Court under which the receiver acts embraces the leasehold estate, it becomes his duty, of course, to take possession of it; but he does not, by taking such possession, become assignee of the term in any proper sense of the word. He holds that as he would hold any other property involved, for and as the hand of the Court, and not as assignee of the term." *Gaither* v. *Stockbridge*, 67 Md., 222; *Quincy M. & P. R. Co.* v. *Humphreys*, 145 U. S., 636.

"In order to bind a receiver, or one standing in a like relation to a leasehold estate, for rents, he must elect to accept the lease, and he thereby becomes vested with the title to the leasehold interest." *In re Otis*, 101 N. Y., 585.

We infer, from briefs of counsel filed in this cause, that the Chancellor allowed these rents to Staub as a preferred claim, upon the idea that they were properly chargeable to the receiver as an operating expense. We find nothing in the record to warrant such an assumption, nor is there any basis for the other contention that there was in fact an adoption of this lease by the receiver. In our opinion, the action of the Chancellor in allowing, as a prior charge upon the funds in the hands of the receiver, rents that accrued from the appointment of the receiver until the confirmation of the sale of

the leasehold, was clearly erroneous.    The result is, that complainants are entitled to a decree against Staub on his refunding bond for the rents so improperly allowed him.

The decree of the Chancellor in the particulars herein indicated will be modified, but in all other respects affirmed.

# CASES

## ARGUED AND DETERMINED

IN THE

# SUPREME COURT OF TENNESSEE

FOR THE

## MIDDLE DIVISION.

---

## NASHVILLE, DECEMBER TERM, 1895.