UFFELMAN et al. v. BOILLIN et al.

Middle Section. February 7 1935.

Petition for Certiorari denied by Supreme Court, May 17, 1935.

4

Horace B. Stout, of Clarksville, and Seay, Stockell & Edwards, of Nashville, for complainants, Uffelman and others.

Collier Goodlett and John S. Daniel, both of Clarksville, for defendants, Boillin and Laurent.

Trabue, Hume & Armistead, of Nashville, for defendants, Cheek and administrator of Hail, deceased.

Wilson, Kyser, Armstrong & Allen, of Memphis, and Chas. V. Runyon, of Clarksville, for defendants, Dunlop and wife.

FAW, P. J. This is a suit by stockholders of the Dunlop Milling Company, a Tennessee corporation, formerly operating a flour and feed mill at Clarksville, Tenn., for many years, including the period covered by the transactions involved in this case, to recover the sum of $130,650, with interest from May 3, 1926, because of an alleged unlawful and ultra vires expenditure of that amount of the funds of the corporation in the purchase by the defendant directors, for the corporation, of 1,005 shares of the common stock of the corporation from Jo P. Dunlop and wife, Laura Dunlop, and other members of their family, and the receipt and retention by the Dunlops of the amount received by them of the funds of the corporation for the alleged unlawful sale by them of said stock.

In their bill the complainants also sought to recover for losses sustained by the corporation through alleged mismanagement of its business by its officers and directors; but this feature of the case was abandoned in the court below, and is not before this court.

The original bill by which this suit was instituted was filed in the chancery court of Montgomery county on October 18. 1930, by H. Z. Uffelman, Charles George Smith, Dr. J. A. Gholson, and Joe R. Stewart, all of whom, as stockholders of the Dunlop Milling Company, sue in their own right and for the use and benefit of the Dunlop Milling Company and all of the stockholders of that corporation, of all classes, similarly situated.

The complainants, respectively, own stock in the Dunlop Milling Company as follows: H. Z. Uffelman, 125 shares of common stock

acquired in 1922 or 1923; Charles George Smith, 10 shares of common stock acquired in 1922; Dr. J. A. Gholson, 10 shares of preferred stock acquired in 1907 or 1908; Joe R. Stewart, 10 shares of common stock acquired about the middle of May, 1926.

The defendants to the original bill are Joseph A. Boillin, E. E. Laurent, L. C. Westenberger, Leslie Cheek, Nashville Trust Company (a Tennessee corporation), administrator with the will annexed of Eustice A. Hail, deceased, and Dunlop Milling Company, a corporation as aforestated.

It is, in substance, alleged in the original bill that defendants Boillin, Laurent, Westenberger, Cheek, and Eustice A. Hail, now deceased (the intestate of Nashville Trust Company, administrator, etc.), constituting the board of directors of the Dunlop Milling Company, on May 3, 1926, purchased 1,005 shares of the common stock of the Dunlop Milling Company from Jo P. Dunlop and his wife, Mrs. Laura Dunlop, and, pursuant to their instructions, the secretary of the corporation paid to said Dunlops the purchase price thereof, to-wit, the sum of $130,650, out of the funds of the corporation, and in this manner said amount of the funds and assets of the corporation was wrongfully and illegally expended by said defendants and said Hail, and the capital stock of the corporation was thus reduced; that since that time said 1,005 shares have remained in the vault in the office of the corporation; that such reduction of the capital stock was not effected in the manner provided by law, but by the arbitrary, unauthorized, and unlawful action of said directors, and amounted to a conversion or misapplication of the corporation's funds; that the defendants, neither as directors nor as officers of the corporation, had any authority to thus use the funds of the corporation; that the corporation itself could not lawfully buy or own its own stock, and the aforesaid acts of the defendants were ultra vires, against public policy, and void.

Complainants further allege in the original bill that, by said purchase of stock from the Dunlops, said Boillin, Cheek, Laurent, and Hail acquired control of the Dunlop Milling Company, and since that time the prosperity of said corporation has steadily declined and its business has lost until it has become insolvent; that it now owes the First National Bank in St. Louis, Mo., and the American National Bank of Nashville, Tenn., approximately the sum of $300,-000, and complainants allege, on information, that on October 15, 1930, the officers of the Dunlop Milling Company met with the representatives of the aforesaid banks at Nashville, Tenn., and admitted the insolvency of the corporation and its inability to pay its debts, and agreed with the representatives of the banks that the corporation should be immediately liquidated and its assets sold and used to pay its debts; that complainants believe that the assets, if properly liquidated, should pay the debts in full, but they

are informed and believe that little or nothing will be left to pay on the preferred stock, and absolutely nothing left for the common stockholders of the corporation; that complainants believe and allege that if the $130,650 had not been withdrawn from the assets of the corporation in the unlawful and unauthorized manner hereinbefore set out, that the money thus available would have carried the corporation over its difficulty and it would now be in sound financial condition, entirely successful, and a valuable going concern.

The original bill contains numerous other allegations with respect to the history of the Dunlop Milling Company and the connection of the defendant directors and Jo P. Dunlop and his family therewith, which, so far as deemed necessary, will be stated later herein.

On November 14, 1930, the complainants filed an amended and supplemental bill against the defendants to the original bill and, in addition, making Jo P. Dunlop and Mrs. Laura Dunlop, nonresidents of the state of Tennessee, E. L. Carney, a resident of Montgomery county, and the First National Bank, a national banking corporation with its situs in Clarksville, Tenn., defendants thereto.

It is alleged in the amended and supplemental bill that of the 1,005 shares of the stock of the Dunlop Milling Company purchased by the defendant directors from the Dunlops as alleged in the original bill, 544 shares were purchased from Jo P. Dunlop and the certificate for same transferred by him to the corporation, and 280 shares thereof were purchased from Mrs. Laura Dunlop and the certificate for same transferred by her to the corporation; that the remaining shares making up the 1,005 shares thus purchased were purchased from other members of the family of Jo P. Dunlop; that said defendant directors paid to said Jo P. Dunlop for himself and for said Mrs. Laura Dunlop $130 per share for said stock, thus making the payment to said Jo P. Dunlop $70,720 for his stock and a payment of $36,400 to said Mrs. Laura Dunlop for her stock; that said purchase from Jo P. Dunlop and Mrs. Laura Dunlop were beyond the powers of the corporation, unlawful, and opposed to the public policy of the state of Tennessee, and the said Jo P. Dunlop and Mrs. Laura Dunlop, as well as the directors of the corporation participating in the transactions, and named as defendants herein, are now personally liable for the funds of the corporation paid to them in said purchase.

It is further alleged that complainants did not name the said Jo P. Dunlop and Mrs. Laura Dunlop as parties defendant to their original bill for the reason that they were then and still are nonresidents of the state of Tennessee and residents of Asheville, N. C., and service of process on them could not be secured, but that com-

plainants have learned that said Jo P. Dunlop and Mrs. Laura Dunlop own certain property in Montgomery county, Tenn., which property (consisting of several tracts of land in Montgomery county and some houses and lots in the city of Clarksville), is described in the bill.

Complainants further allege that the said Jo P. Dunlop is the owner and holder of a promissory note executed to him by the defendant E. E. Laurent for the approximate sum of $182,000, which note was executed for the purchase of common stock of the Dunlop Milling Company from said Dunlop by the said Laurent, and the note is secured by one or more certificates of the common stock of the Dunlop Milling Company issued to the said Laurent and aggregating 2,000 shares thereof, and that this note, with said certificates attached, is now either in the possession of the defendant First National Bank or E. L. Carney, having been left with either said bank or the said Carney by the said Dunlop.

Complainants pray, in their amended and supplemental bill, for a decree against the said Jo P. Dunlop for the said sum of $70,720, with interest from the date of the sale of the stock to the said Dunlop Milling Company, and for a decree against the defendant Mrs. Laura Dunlop for the sum of $36,400, the amount paid her for her stock in said Dunlop Milling Company.

Complainants also pray that the First National Bank of Clarksville and E. L. Carney be enjoined from delivering to either the said Jo P. Dunlop or the said Mrs. Laura Dunlop, or to any other person for them or either of them, any property of any kind whatever or choses in action, belonging to either the said Jo P. Dunlop or Mrs. Laura Dunlop, that they or either of them may hold or have in possession, and that they be enjoined and required to retain all such property now in their custody, or under the control of either of them, pending the final decree in this cause.

And complainants pray that an attachment issue and be levied upon the real estate of the said Jo P. Dunlop and Mrs. Laura Dunlop mentioned and described in said amended and supplemental bill. and that said real estate and said Laurent note and stock be sold under proper decree of the court for the satisfaction of any and all decrees and recoveries granted the complainants in this cause, and that said real estate be sold upon terms of not less than six months nor more than twenty-four months and in bar of the equity of redemption.

Pursuant to a fiat of the chancellor, an injunction and attachment issued, and were executed, as prayed for in the amended and supplemental bill.

On November 17, 1930, an intervening petition was, by leave of the court, filed by E. R. Tandy and thirteen others named, as owners of preferred stock of the Dunlop Milling Company. praying

for leave to intervene and become parties complainant in this cause to the same extent as if they had been parties complainant in the original bill. According to the petition and the proof, these petitioners are the respective owners of preferred stock of the Dunlop Milling Company; the fourteen petitioners owning an aggregate of 450 shares. It is stated in the petition that 125 other shares of such preferred stock are outstanding in named owners.

It is further alleged in said intervening petition (in addition to the allegations of the original bill respecting the present insolvency of the Dunlop Milling Company) that, following the meeting of the officers of the corporation with the representatives of its creditor banks in Nashville, Tenn., on October 15, 1930, a special meeting of the stockholders of the Dunlop Milling Company was held, pursuant to a call by its president, on October 30, 1930, when its officers stated to the meeting that the corporation was insolvent, could not pay its debts and meet its financial obligations, and recommended that, in accordance with the demand of its creditor banks, the corporation be liquidated; that the officers recommended to the stockholders at that meeting that the stockholders adopt and pass a resolution authorizing the president to execute and deliver to Iglehardt Bros., of Evansville, Ind., an option to purchase the plant, tradename, and good will of the corporation, at the price of $50,000, to be paid in cash; that both of these recommendations of the officers were accepted by the common stockholders, and resolutions in accordance therewith were adopted; that these petitioners, as preferred stockholders, had no voice or vote on these resolutions; and that petitioners are not advised and do not know whether Iglehardt Bros. have or have not exercised the option granted them.

The petitioners further say that they believe and charge that the assets of the corporation, upon liquidation, will not pay the expense of liquidation and the debts and claims of the preferred stockholders, but that the preferred stockholders will suffer a large, if not a complete, loss of their investment.

Jo P. Dunlop and wife, Mrs. Laura Dunlop, filed an answer to the original bill and the amended and supplemental bill on January 5, 1931. The substance of their answer is that, in 1918, one of the sons of Jo P. Dunlop was ill and Jo P. Dunlop removed from Clarksville, Tenn., to Asheville, N. C., to devote himself to his son's recovery, and for some time prior to May 3, 1926 (when the stock was transferred and paid for), he had not engaged actively in the management of the mill, nor was he familiar with the details of its operations; that early in 1926, E. E. Laurent, then in active charge of the mill, interested himself in effecting a sale of the stock owned by the defendants Jo. P. Dunlop and Laura Dunlop and members of their family, and associated with himself Boillin, a former stockholder and director, Cheek and Hail, substantial busi-

ness men of reputed means; that the negotiations for this sale were conducted by defendant Jo P. Dunlop with this group and with them alone; that the result of the negotiations was that Dunlop, for himself and his family, agreed with the defendants Laurent, Cheek, Boillin, and Hail, to sell all of their stock, which consisted of 1,005 shares, to them, and to them alone; that they (the Dunlops) were unacquainted with the manner in which the stock sold to the group was to be prorated among them; and that at no time did any member of the group represent himself as acting for the Dunlop Milling Company, and at no time, to the knowledge of the Dunlops, was the corporation contemplated as a purchaser; that at the time of the final closing of the transaction and passing the money, the Dunlops received, in addition to individual checks of defendants Cheek, Boillin, and Laurent and their individual notes, two checks of the Dunlop Milling Company; that they did not transfer any certificates of stock to the Milling Company and they sold no stock to the Milling Company; that the stock was transferred in blank and delivered by them to the group of purchasers; that they (the Dunlops) were unacquainted with what occurred in the directors' meeting of the corporation after the retirement of Jo P. Dunlop from the board of directors, nor did they know what disposition was made of the shares of stock; that the fact that payment for some of the stock in the Milling Company was in the form of checks from the Milling Company did not indicate to the defendants that they were selling stock to the Dunlop Milling Company, since their agreement was to sell to this group of purchasers, and they (the Dunlops) supposed that checks of the corporation given to them were matters of convenience properly taken care of between the corporation and the individual members of the group under which the corporation actually paid no part whatever of the purchase price. They denied that they had any notice, knowledge, or suspicion that any of the corporation's funds were being diverted or were being actually used for the purpose of such payment. They state that they knew the moral and financial reputation and means of the purchasers and directors, and had neither information nor suspicion that their stock was being purchased by the Milling Company, or that any funds of the corporation were being improperly diverted. They denied that $70,720 in payment of the stock was received by Jo P. Dunlop and $36,400 was received by Laura Dunlop, and they denied that 544 shares of the stock were purchased by the corporation from Jo P. Dunlop and 280 shares from Laura Dunlop, and they denied that certificates of stock for the same were transferred by them or either of them to the corporation, and they generally denied any and all liability to the complainants for any sum whatever.

Joseph A. Boillin, Leslie Cheek, and Nashville Trust Company,

administrator, etc., of Eustice A. Hail, answered the original bill and amended and supplemental bill on February 4, 1931, and, on July 15, 1931, they filed, by permission of the court, an amendment to their answer. On July 15, 1931, E. E. Laurent filed a brief answer adopting the answer of his codefendants, Boillin, Cheek, and Nashville Trust Company, administrator, etc., and the amendment thereto, as his answer to the original and amended and supplemental bills.

By their answers Boillin, Cheek, Laurent, and the administrator of Hail denied that the aforesaid purchase of stock from the Dunlops was unlawful, ultra vires of the Dunlop Milling Company or its directors, or amounted to a misappropriation or misapplication of the funds of the corporation. They alleged, in substance, that the purchase of said stock by the Dunlop Milling Company was authorized by its board of directors at a regular meeting of said board; that such purchase was ratified at the regular annual meeting of the stockholders of the Dunlop Milling Company on June 2, 1926, by vote of more than two-thirds of the outstanding voting stock of said corporation, and notice of said meeting was given to each holder of common and preferred stock; that the defendant directors acted in good faith and for the interest and benefit of the corporation's stockholders and without receiving or expecting any substantial benefit to themselves; that the owners of the common and preferred stock of the corporation knew, or were charged with knowledge, of the transactions; that the financial reverses afterwards suffered by the Dunlop Milling Company were the result of economic conditions, business depression, and other factors over which the defendant directors had no control; that complainants are precluded and estopped, because of their acquiescence and laches, from prosecuting this suit; that if the defendant directors are liable at all, their liability is secondary to that of Jo P. Dunlop and Mrs. Laura Dunlop; and that in no event should there be a recovery for the benefit of any stockholder who participated in the transaction, or had, or was chargeable with, knowledge thereof, or any stockholder who purchased his stock after the transaction complained of in the bill.

Defendant Westenberger did not join in the answer of the other directors, but filed a separate answer, in propria persona, in which he specifically admitted substantially all of the material allegations of the bill of complainants, and stated that he considered himself as an employee only, and also was so considered by the said Laurent, Hail, Cheek, and Boillin, and had always been so considered by the said Jo P. Dunlop, and in connection with the transactions involved in this suit he merely complied with orders given him as an employee; that his duties as assistant secretary and later on as secretary of the corporation were clerical only, and he never at any time

acted in any executive capacity or had anything to do with shaping the policies of the corporation; that he acted in reliance upon the orders received, and he supposed that the action taken by the board of directors was authorized and was lawful, and he never had any intention or desire to do the corporation or its stockholders any injury.

Defendant Westenberger also states in his answer that he is now advised that the action of the board of directors was unlawful, and that the defendants sued herein as directors and said Jo P. Dunlop and Mrs. Laura Dunlop are legally responsible therefor, but that he is also advised that any recovery in this case will be for the benefit of all the shareholders of the corporation, and he submits that he, as one of such shareholders, is entitled to participate in such recovery in proportion to the stock held by him.

We have mentioned all the pleadings, except a petition filed on June 25, 1932, by Mrs. W. T. Bigby, alleging that she is the owner of 20 shares of the common stock of the Dunlop Milling Company and praying that she be permitted to file her said petition and to intervene and become and be made a party complainant in this cause to the same extent as if she had been a party complainant in the original bill filed October 19, 1930, and the amended and supplemental bill filed November 14, 1930.

No defense was made by or on behalf of the Dunlop Milling Company, and a decree taking the complainant's bill for confessed was entered against it.

In this connection it may be said that prima facie it would seem to be an anomalous procedure to name as a defendant to the bill one of the parties for whose use and benefit the suit is brought. The Code provides (section 8619) that, "In all suits prosecuted in the name of one person for the use of another, the person for whose use the suit is brought shall be held to be the real plaintiff of record." However, it is said in 2 Cook on Corporations (6th Ed.), sections 846, 847, that in such cases the corporation should be made a defendant; and this is analogous to the Tennessee practice in general creditors' suits, wherein it is usual for a creditor suing on behalf of himself and all other creditors of the common debtor to name other creditors as defendants. No point is made concerning this matter by any of the parties, and if it was irregular it was a harmless irregularity, and no further notice of it is necessary.

A large amount of proof was taken and filed in the form of depositions of witnesses, with numerous documentary exhibits, and the cause was heard by Chancellor Holmes, sitting by interchange with Chancellor Stout, upon the pleadings, proof, and argument of counsel, and after holding the case under consideration for a time, the chancellor filed his findings and opinion as follows:

"On the controverted questions of fact I find as follows;

**12**

"(1) The defendants, Jo P. Dunlop, and Mrs. Laura Dunlop, did not sell any shares of stock to Dunlop Milling Company.

"(2) The defendants, Boillin, Laurent, Westenberger, Cheek, and Eustice A. Hail, deceased, did purchase, for the corporation, from E. E. Laurent, trustee for himself, Boillin, and Hail, 1,000 shares; and did, also, purchase from the Dunlops, for the corporation, other 5 shares. But neither Jo P. Dunlop, nor Mrs. Laura Dunlop, knew that said other 5 shares were being purchased for the corporation.

"(3) Jo P. Dunlop and Mrs. Laura Dunlop knew, or should have known, that the funds of the corporation were being used to pay for the shares transferred by them.

"(4) The purchase for the corporation was ultra vires both of the corporation and of the directors.

"(5) The directors in making the purchase for the corporation were acting in good faith, and for what they deemed to be the best interest of all of the stockholders.

"(6) It appears that many of the stockholders knew of the transaction at the time it was consummated; that some of them became informed thereafter; that, perhaps, some stockholders were not informed until after the corporation became insolvent.

"Conclusions.

"Upon these, and the undisputed facts, I am of opinion:

"(1) Except as hereinafter stated, complainants, for the corporation (themselves and all other stockholders), are entitled to recover of the defendants, jointly and severally, the amount of corporate funds expended in the purchase of shares of stock, to-wit, $130,650, with interest since May 2, 1926.

"(2) Jo P. Dunlop and Mrs. Laura Dunlop were not made defendants to the original bill; and, of course, in that bill no relief was sought as to them. They were brought in by an amended and supplemental bill, in which it is alleged:

" 'The complainants now aver that of the 1,005 shares thus purchased by the defendants from the Dunlops, 544 shares were purchased from Jo P. Dunlop and the certificate for same transferred by him to the corporation, and 280 shares were purchased by the defendants from Mrs. Laura Dunlop and the certificate for same transferred by her to the corporation. That the remaining shares, making up the 1,005 shares thus purchased, were purchased from other members of the family of Jo P. Dunlop. Said defendants paid to the said Jo P. Dunlop for himself and, for the said Mrs. Laura Dunlop $130.00 per share for said stock, thus making the payment to the said Jo P. Dunlop $70,720.00 for his stock and a payment of $34,400.00 to the said Mrs. Laura Dunlop for her stock.'

"The answer of Jo P. and Mrs. Laura Dunlop contains the following admission:

" 'That at the time of the final closing of the transaction and the passing of money, your defendants received, in addition to individual checks of defendants, Cheek, Boillin and Laurent, and individual notes of Boillin, Laurent and Eustice A. Hail, two checks of The Dunlop Milling Company.'

"Of course there can be no recovery against the defendants, Dunlop, for an amount in excess of the amount claimed against them in the bill.

"(3) As hereinabove stated, it appears that many of the stockholders knew of this transaction. It also appears that all of the creditors of the corporation have been paid in full; that any recovery herein will be for the benefit of stockholders.

"Without taking the trouble to define and distinguish between 'estoppel,' 'ratification,' 'acquiescence,' 'laches,' etc., I am of opinion that there should be no recovery herein for the benefit (a) of any stockholder who participated in the transaction; nor (b) for the benefit of any stockholder who, for any appreciable length of time before a receiver for the corporation was appointed, knew of the transaction; nor (c) for the benefit of any shareholder who, subsequent to the transaction complained of, purchased his shares from one who had knowledge of the transaction.

"(4) The recovery for the benefit of the stockholders should be proportionate, that is, in the ratio of the number of his shares to the whole number of shares, and their whole number must include the 1,005 shares.

"(5) Complainants are entitled to recover, in addition to their proportionate shares, for counsel fees.

"(6) It will be necessary to have a reference upon the basis herein outlined.

"Final judgment will await the report.

"(7) Because the reference will be burdensome and costly, if either party so desires, an appeal from this decree will be allowed now.

"I have not deemed it necessary, in a cause so well and carefully prepared and presented, to enter into any discussion of the proof nor of the legal questions involved.

"Decree as hereinabove indicated.

"[Signed] Holmes, Chancellor."

Thereupon a decree was made and entered as follows:

"It is accordingly ordered, adjudged, and decreed as follows:

"(a) That the above findings of fact numbered (1) to (6), inclusive, be and they are made the judgment of the court; and

"(b) That such of the complainants as may not be excluded under the principles of paragraph (f) below are entitled to recover (1) for the benefit of such preferred stockholders as may not be so excluded, for the par value of their preferred stock and the ac-

cumulated unpaid dividends, and (2) for the benefit of such of the common stockholders as may not be so excluded, in such proportion as the number of shares of common stock owned by them bears to 5,960 shares, being all of the common stock of said corporation; and

"(c) That the recovery above allowed shall be joint and several and shall be limited (1) as to Mrs. Laura Dunlop (a) to the sum of $36,400, and interest from May 2, 1926, as to such preferred stockholders, and (b) to such sum and interest, less the recovery against her for such preferred stockholders, as to such common stockholders; (2) as to Jo P. Dunlop (a) to the sum of $70,720 and interest from May 2, 1926, as to such preferred stockholders, and (b) to such sum and interest, less the recovery against him for such preferred stockholders, as to such common stockholders; (3) as to Joseph A. Boillin, Leslie Cheek, E. E. Laurent, L. C. Westenberger, and Nashville Trust Company, administrator of Eustice A. Hail (a) to the sum of $130,650 and interest from May 2, 1926, as to such preferred stockholders, and (b) to such sum and interest, less the recovery against them for such preferred stockholders, as to such common stockholders; and (4) so that the aggregate and entire amount recovered from all defendants shall not exceed the sum of $130,650 and interest from May 2, 1926; and

"(d) That the realty attached in this cause as the property of Mrs. Laura Dunlop be sold to satisfy the recovery against her; and

"(e) That the realty attached in this cause as the property of Jo P. Dunlop be sold to satisfy the recovery against him; and

"(f) That those entitled to the foregoing recoveries shall not include (1) any stockholder who participated in the transaction or (2) any stockholder who for any appreciable length of time before a receiver for the corporation was appointed knew of the transaction, or (3) any stockholder who subsequent to the transaction complained of purchased his shares from one who had knowledge of the transaction; and

"(g) That a reference be had to the clerk and master to report from the proof and any additional proof that may be offered within 60 days from the date of entry of this decree (1) the number of shares of stock held by each of the preferred and common stockholders of said company, and the date acquired, (2) what accrued dividends on the preferred stock of said company are unpaid, and (3) which of the stockholders of said company are, under the principles of paragraph (f) above, to be included in the recovery and which are to be excluded; and

"(h) That the proceeds of the recovery in this cause shall be apportioned among such of the stockholders as may not be excluded under the principles of paragraph (f) above, in proportion to the number of shares held by each; and

"(i) That final judgment is reserved until the coming in of the report hereinabove directed to be made by the clerk and master; and

"(j) That because the reference will be burdensome and costly, if either party so desires, an appeal from this decree will be allowed now.

"To the foregoing decree the defendants jointly and severally except and pray an appeal to the Court of Appeals at Nashville, which appeal is granted, and defendants, and each of them, either jointly or severally, may perfect such appeal by executing a proper cost bond therefor within 10 days from the entry of this decree.

"To the action of the court in the foregoing decree in:

"(1) Excluding any of the complainants or interveners from the benefit of the recovery decreed.

"(2) In holding that those entitled to the recovery granted should not include (a) any stockholder who participated in the transaction, (b) any stockholder who, for any appreciable length of time before a receiver for the corporation was appointed, knew of the transaction, or (c) any stockholder who, subsequent to the transaction complained of, purchased shares from one who had knowledge of the transaction.

"(3) In directing the clerk and master to report, which of the stockholders are to be included in the recovery and which are to be excluded.

"(4) In decreeing that the recovery be apportioned among such of the stockholders as may not be included under the principles of paragraph (f) of the decree in proportion to the number of shares held by each.

"(5) In failing to decree a recovery against all the directors for the full sum of $130,650, with interest from May 2, 1926, and in failing to decree against Jo P. Dunlop for the full sum of $70,720, and in failing to decree against Mrs. Laura Dunlop in the full sum of $36,400, both with interest from May 2, 1926, for the benefit of the corporation.

"(6) And in failing to hold and decree that none of the stockholders of the Dunlop Milling Company are to be excluded from the benefits of the decree by reason of estoppel, laches, acquiescence, ratification, or for any other cause.

"(7) And to those portions of the decree which so decree and fail to so decree the complainants H. Z. Uffelman, Charles George Smith, J. A. Gholson, and Joe R. Stewart, and the interveners, E. R. Tandy, M. L. Hughes, T. B. Fairleigh, Miss Sarah Hanratty, F. N. Smith, John J. Hanratty, H. P. Pickering, Miss Marion H. Martin, Mrs. Susie Cross, Miss C. H. Cooke, Mrs. Sarah Hanratty, Mrs. F. E. Catlett, Miss Margaret Watson, Mrs. Maggie Lowe, and Mrs. W. T. Bigby, except and from those portions of the decree said complain-

ants and interveners pray an appeal to the Court of Appeals of Tennessee at Nashville, which appeal is by the court granted, said complainants and interveners having entered into bond for such appeal in the sum of $750, with Horace B. Stout as surety thereon, which appeal bond has been this day duly filed with the clerk and master of this court in this cause.''

The appellants (except defendant Westenberger) perfected their respective appeals, and have filed assignments of error in this court, not jointly, but in groups; that is to say, the assignments of error are in four separate groups: (1) Assignments of defendants Jo P. Dunlop and Mrs. Laura Dunlop; (2) assignments of defendants Joseph A. Boillin and E. E. Laurent; (3) assignments of defendants Leslie Cheek and Nashville Trust Company, administrator, etc., of Eustice Hail, deceased; and (4) assignments of the complainants and the intervening petitioners.

In the investigation and consideration of the numerous and, in some instances, complicated and difficult questions of fact and law presented by the assignments of error, the court has been aided by able and exhaustive briefs and arguments of counsel for the parties, respectively.

In order that the ultimate determinative facts, and the application of the law thereto, may be better understood, we will now state certain facts disclosed by the record which are undisputed in the evidence, or (where some details may be disputed) supported by the preponderance of the evidence.

The history of the Dunlop Milling Company, with special reference to its corporate name and authorized capital stock, is as follows: The Rabbeth & Dunlop Milling Company was regularly chartered as a corporation under the laws of Tennessee on June 17, 1897, with power to manufacture and sell flour and feeds, and with an authorized capital of $54,000 of common stock.

On April 1, 1902, the charter was amended so as to change the name to ''the Dunlop Milling Company.''

On June 9, 1904, the charter was again amended so as to increase the capital stock to $100,000.

On May 10, 1907, the charter was further amended by increasing the capital stock so as to consist of $100,000 of 7 per cent. cumulative preferred stock of the par value of $100 per share, and $200,000 of common stock of the par value of $100 per share.

On the same day that the last-mentioned amendment to the charter was authorized and applied for (May 10, 1907), the stockholders adopted a by-law providing for cumulative dividends on the preferred stock, as follows: ''In liquidation or on dissolution, the holders of the preferred stock shall be entitled to be paid in full both the par value of their shares and the unpaid dividends accrued

thereon, before any amounts shall be paid to the holders of common stock.''

On December 23, 1920, the charter was again amended so as to increase the common stock from $200,000 to $500,000 by issuing $300,000 of additional common stock.

On December 8, 1922, the charter was again amended by increasing the common stock from $500,000 to $1,000,000, by issuing $500,000 of additional common stock.

At all times after the last charter amendment above mentioned (December 8, 1922), the authorized capital stock of the Dunlop Milling Company consisted of $1,000,000 of common stock in shares of the par value of $100 each, and $100,000 of 7 per cent. cumulative preferred stock in shares of the par value of $100 each.

We do not think it an extravagant statement to say that the business of the Dunlop Milling Company, from its incorporation to the year of 1928, was extraordinarily profitable. The dividends received by the stockholders, year by year, are shown in the record. A summary thereof (presumably made up by counsel) is set forth in the brief for Boillin and Laurent, as follows:

''Prior to the issuance of such Corporation's preferred stock May 10, 1907, its common stockholders received a total of two hundred and fifty-two per cent in cash dividends, an average of over thirty-one per cent per annum. Its preferred stockholders received seven per cent per annum in cash dividends until 1930, when they were paid only three and one-half per cent and such Corporation was forced to suspend.

''From 1918 until 1928 such Corporation's common stockholders received four hundred and eighty-seven per cent in cash, an average of over twenty-three per cent per annum, and a total of two hundred per cent in stock. From 1897 to 1928 such stockholders received seven hundred and thirty-nine per cent in cash, an average of over twenty-three per cent per annum, and a total of two hundred per cent in stock.

''Such common stockholders received a total of ninety-two per cent in cash, an average of more than nine per cent per annum, from 1907 to 1916, twenty per cent in cash in 1917, twenty per cent in cash in 1918, ten per cent in cash in 1919, two hundred and thirty per cent in cash and one hundred per cent in stock in 1920, ten per cent in cash in 1921, thirty per cent in cash and one hundred per cent in stock in 1922, twenty per cent in cash in 1923, twenty per cent in cash in 1924, twenty per cent in cash in 1925, five per cent in cash in 1926, twelve per cent in 1927, and eight per cent in cash in 1928.

''From 1918 to 1925 such common stockholders received a total of three hundred and sixty per cent in cash, an average of forty-five per cent per annum, and a total of two hundred per cent in

stock. From 1920 to 1925 such common stockholders received a total of three hundred and twenty per cent in cash, an average of sixty-four per cent per annum, and a total of two hundred per cent in stock."

We have not undertaken to verify the calculation thus made, but assume that it is correct. The record discloses the facts and figures upon which it is based.

Defendant Jo P. Dunlop was engaged in the milling business at Clarksville as a member of the partnership of Rabbeth & Dunlop from 1892 until 1897, when the business was incorporated as before stated. For the first three or four years after the incorporation, John T. Rabbeth was the president and active manager of the corporation, and Jo P. Dunlop was the secretary-treasurer. In 1900 or 1901, Rabbeth's relations with the company were severed, and from that time until August, 1918, Jo P. Dunlop actively managed, controlled, and directed the affairs of the corporation. He retained his office of secretary-treasurer and was given the "additional title of General Manager." He was also a member of the board of directors. During the period last mentioned, and until May 3, 1926, H. M. Dunlop, a brother of Jo P. Dunlop, was president of the company, but he was engaged in other business and took no active part in the management of the Milling Company, other than attending meetings of the board of directors.

In August, 1918, Jo P. Dunlop and wife, upon the advice of physicians, took one of their sons who had become ill, to Asheville, N. C., and maintained a residence at that place until May 3, 1926, and thereafter. But, notwithstanding his removal to North Carolina, Jo P. Dunlop retained his official connection with the Dunlop Milling Company and (together with his family) owned a large majority of its common stock, and he says, in his testimony, that he considered himself "the active operating head of it until in 1926," and "made frequent trips back to Clarksville for different durations."

However, upon the removal of Jo P. Dunlop to Asheville in 1918, the management and direction of the details of the business of the Dunlop Milling Company was placed in the hands of defendant E. E. Laurent, a member of the "organization" that had been built up by Jo P. Dunlop. Mr. Laurent was sales manager of the Dunlop Milling Company from 1913 until he was elected vice president in 1919, and he retained the latter title until May 3, 1926, when he was elected president of the corporation under circumstances to which more particular reference will be made later herein.

Notwithstanding the fact that Jo P. Dunlop continued to hold the offices of secretary-treasurer and general manager after he removed to Asheville and until May 3, 1926, which, with his stockholdings, gave him the power to control the policies and affairs of

the corporation, it is evident that E. E. Laurent was (as he states) "the man on the ground that was General Manager" during that period.

Prior to 1924, defendant Jo P. Dunlop acquired more than 8,000, and less than 9,000, of the 10,000 outstanding shares of the common stock of the Dunlop Milling Company, but "distributed" a part of it among the members of his immediate family, viz., his wife, the defendant Laura Dunlop, and his three children, Jo P. Dunlop, Jr., Charles G. Dunlop, and Mrs. Allen Brown. However, defendant Jo P. Dunlop "controlled" the stock thus held by the members of his family, and "would transfer it as he saw fit" and, "attended to all matters in connection with" it.

Defendant Jo P. Dunlop, according to his own testimony, kept no personal bank account for many years prior to the sale of his stock to his codefendants on May 3, 1926, but used "the mill" as a "kind of clearing-house." His "income from the mill" was credited to his personal account on the books of the mill, and his "bills" were paid by checks of the Milling Company and charged to his account. The members of his family also had accounts on the books of the mill, and their "bills" were likewise paid by checks of the Milling Company charged to their respective accounts as he directed.

During the period just mentioned, defendant Jo P. Dunlop, from time to time, invested large sums in speculations in "futures," buying grain and stocks "on margin." Some of these investments were on his personal account and some for the account of the Milling Company, and charges and credits were made accordingly on the books of the Milling Company.

In the manner stated, defendant Jo P. Dunlop and the members of his family became heavily indebted to the Milling Company, and in order to settle this indebtedness they "surrendered" to the Milling Company 1,000 shares of their stock in 1924, and 3,000 shares in 1925, at the price of a "little more" than $110 per share. The 4,000 shares of common stock thus "surrendered" to the corporation were not reissued.

It seems that, at some time prior to May 3, 1926, 40 additional shares of common stock were "surrendered" by some one in some manner not explained on the record, as the chancellor found that 5,960 shares of common stock were outstanding prior to that date, and that finding is not questioned.

After the "surrender" of 4,000 shares of their stock to the Milling Company in 1924 and 1925, as above stated, defendants Jo P. Dunlop and his family owned 4,005 shares, which they sold and transferred on May 3, 1926, in the manner hereinafter stated. This included 101 shares owned by H. M. Dunlop, the brother of Jo P. Dunlop and then president of the Milling Company. In the latter part of 1925, or the early part of 1926, a tentative agreement was

reached between Jo P. Dunlop and Caldwell & Co., of Nashville (with defendant Laurent as the intermediary), for a sale of all the stock of the Dunlop Milling Company held by the Dunlops to Caldwell & Co. at the price of $150 per share, but this proposed purchase contemplated the consolidation of the Dunlop Milling Company with two other milling companies, which consolidation was not effected, and the purchase by Caldwell & Co. was abandoned.

Shortly after the abandonment of the sale to Caldwell & Co., defendant Laurent interested defendant Boillin in a plan to "interest local capital" with a view of buying the stock held by the Dunlops, by means of an increase of the preferred stock and the sale of common stock, but defendant Laurent says that "those negotiations fell through . . . on account of a lack of desire on the part of preferred stockholders to change their holdings, or to subscribe for additional preferred stock."

Later, in April, 1926, Boillin interested Hail in the purchase of the Dunlop stock, and Hail interested Cheek, and, as the result of negotiations conducted by a visit of Laurent to Dunlop at Asheville, and communications by telegraph and telephone between the proposed purchasers (except defendant Cheek) and Dunlop, an agreement was reached on or about April 24th, whereby Jo P. Dunlop· agreed to sell and the four parties, Laurent, Boillin, Hail, and Cheek, agreed to buy the entire stockholdings of the Dunlops in the Dunlop Milling Company (which all the parties then understood to be 4,000 shares of common stock) at the price of $130 per share.

Laurent had a private agreement with Dunlop that he would pay Dunlop an additional $20 per share for 1,000 shares, which Dunlop and Laurent spoke of between themselves as a "bonus," and which was unknown to the other purchasers during the negotiations. After the aforesaid agreement with Dunlop, the four purchasers entered into a written agreement among themselves relative to the division and disposition of the stock which they had agreed to purchase from Dunlop, which agreement was as follows:

"We, Jos. A. Boillin, E. E. Laurent, Leslie Cheek & Eustice Hail, have agreed to purchase from Jos. P. Dunlop four thousand shares common stock in Dunlop Milling Co., a Tennessee corporation, at the agreed price of $130.00 a share payable as may be hereafter agreed upon.

"It is hereby agreed between the parties hereto that the said 4000 shares of Dunlop Milling Co. stock is to be divided and settled for as follows:—E. E. Laurent is to receive & settle for 1000 shares; Jos. A. Boillin is to receive and settle for 750 shares; Leslie Cheek and Eustice Hail, jointly, are to receive and settle for 1000 shares; Hail is to receive and settle for 250 shares and E. E. Laurent, Trustee for himself Joseph A. Boillin & Eustice A. Hail is to receive 1000 shares.

"It is agreed and understood that the 1000 shares herein subscribed for by E. E. Laurent, as trustee, for himself, Jos. A. Boillin and Eustice A. Hail, shall be surrendered to Company for cancellation, if and when the directors and shareholders of the Dunlop Milling Co. shall so request in writing at same price herein mentioned.

"It is further agreed and understood by the undersigned that in event the shareholders of Dunlop Milling Co. should decide to retire its present issue of preferred stock they will subscribe to a new issue of preferred not exceeding total of $200,000, 7% cumulative in the proportion of ownership of common stock as herein shown.

"This April 26, 1926.

> "E. E. Laurent
> "Jos. A. Boillin
> "Leslie Cheek
> "Eustice A. Hail

"We agree to transfer to E. E. Laurent 500—five hundred shares of within mentioned stock at purchase price $130.00 a share, in case he desires to purchase same at date of completing purchase contract with Jo P. Dunlop.

> "Eustice A. Hail."

Pursuant to a previous agreement, the parties met at the offices of the Dunlop Milling Company, in Clarksville, on May 3, 1926, for the purpose of consummating the sale and purchase of the Dunlop stock, and much of what transpired on that occasion is reflected in the minutes of a meeting of the board of directors of the Dunlop Milling Company then held, which minutes are as follows:

"Special Meeting of Board of Directors

"Dunlop Milling Company held at the Office of the Company May 3rd, 1926.

"A special meeting of the Board of Directors of this Company was held by consent of all the Directors at the time and place above mentioned and the following Directors were present: Jo P. Dunlop, H. M. Dunlop, John Ward, E. E. Laurent and L. C. Westenberger. The President stated that a quorum was present and the meeting was then opened for the transaction of business.

"Thereupon, Mr. H. M. Dunlop tendered his resignation as President and Director of the Company and such resignation was unanimously adopted. He then withdrew from the meeting.

"Thereupon, Mr. E. E. Laurent was elected President to fill the vacancy caused by Mr. H. M. Dunlop's Resignation as President.

"Thereupon, Mr. Jo P. Dunlop tendered his resignation as Secretary and Director of the Company and on a motion seconded and unanimously adopted, said resignation was accepted.

"Thereupon, Mr. L. C. Westenberger was elected Secretary of

the Company to fill the vacancy caused by Mr. Jo P. Dunlop's resignation and Mr. Jos. A. Boillin was elected Director to fill the vacancy caused by Mr. Dunlop's resignation as Director.

"Thereupon, Messrs. H. M. Dunlop and Jo P. Dunlop withdrew from the meeting and Mr. Jos. A. Boillin entered the meeting and took his seat as Director.

"Thereupon, Mr. Eustice A. Hail was nominated and unanimously elected a Director to fill the vacancy caused by Mr. H. M. Dunlop's resignation, and entered the meeting and took his seat as Director.

"Thereupon, Mr. John Ward tendered his resignation as Director of the Company and said resignation was on motion unanimously adopted.

"Thereupon, Mr. Leslie Cheek was elected a Director of the Company to fill the vacancy caused by Mr. Ward's resignation. Mr. Ward then withdrew and Mr. Cheek entered the meeting and took his seat as Director.

"Thereupon, Mr. W. H. Green was nominated and unanimously elected Vice-President of the Company.

"The following resolution was then introduced and unanimously adopted:

"Whereas, E. E. Laurent holds in his name as Trustee, 1,000 shares of the common capital stock of this company and has offered to sell same to the Company for $130.00 per share on condition that the same will be retired and cancelled.

"Therefore, be it resolved by the Board of Directors that the proposition of Mr. Laurent to sell said 1,000 shares of stock at $130.00 per share be and the same is hereby accepted on the terms proposed by him and said stock shall not be transferred or reissued without the consent of the stockholders.

"Be it further resolved that a recommendation be and same is hereby made to the stockholders that the capital stock of the Company be reduced so as to authorize the retirement of said stock.

"Thereupon, the following resolution was introduced and unanimously adopted:—

"Be it resolved by the Board of Directors that a recommendation be and the same is hereby made to the stockholders that the present outstanding issue of preferred stock be retired and that in lieu thereof, there be issued 2,000 shares of preferred stock with a par value of $100 00 per share, the same to bear 7% cumulative dividends and may be called for retirement on any interest payment date after five years from this date at $105.00 per share. Be it further resolved that the present preferred stockholders shall have the preference to subscribe for said issue of preferred stock in proportion to their present holdings of preferred stock.

"The following resolution was then introduced and unanimously adopted:

"That a recommendation be and the same is hereby made to the stockholders that the charter be amended so as to reduce the authorized common capital stock from $1,000.000.00 to $500,000.00 and that the authorized preferred stock be changed so as to retire the present issue of preferred stock and to create a new preferred stock in the amount of $200,000.00 which shall bear 7 % cumulative dividends and may be called for retirement at $105.00 per share from and after five years from this date.

"Be it further resolved that a recommendation be and the same is hereby made to the stockholders, that all common stock held in the Treasury together with the 1,000 shares of stock this date purchased from E. E. Laurent, Trustee be retired and cancelled as soon as the authorized capital stock shall be reduced.

"Be it further resolved that E. E. Laurent, President; and L. C. Westenberger, Secretary and Treasurer are authorized from this date to sign the firm's name to all transactions of business.

"There being no further business to come before the meeting, the same was, on motion, adjourned.

"E. E. Laurent, Pres.

"L. C. Westenberger, Sec'y."

Jo P. Dunlop delivered the stock certificates (with a transfer "in blank" signed by the holder on each certificate) to the four purchasers, as a body, and after the adjournment of the directors' meeting they (the purchasers) calculated the amounts of the cash payments to be made and notes to be executed by each purchaser, and delivered to Jo P. Dunlop checks and notes aggregating the total amount of the purchase price.

In summing up the shares, it was discovered that the Dunlops owned 4,005 shares, instead of 4 000, as had been supposed, and a separate check of the Milling Company for $650 was issued and delivered to Jo P. Dunlop along with the other checks and notes.

The total purchase price was $540,650, of which $225,650 was paid in cash (or checks accepted as cash), and for the remainder, $315,000, notes of the individual purchasers were executed, with shares of Dunlop Milling Company stock attached as security. The cash payment was made by checks of Boillin, Hail, Cheek, and Laurent, amounting in the aggregate to $95.000, and three checks of the Dunlop Milling Company, aggregating $130.650.

Relative to the bank deposits against which the aforesaid checks of the Dunlop Milling Company for $130,650 were drawn:

It appears that in April, 1926, at a time when the Milling Company had a balance in bank to its credit of approximately $30,000, its notes for $100,000 were, upon the orders and at the direction of defendant Laurent, sold "on open market," through brokers in New

York and Chicago, and the proceeds placed to the company's credit in bank. Then, on April 30, 1926, the Milling Company sold $40,000 of United States Liberty bonds, which had been owned by it for several years, and this latter sum was likewise placed to its credit in bank.

After the settlement was concluded, defendant Laurent gave to Jo P. Dunlop (at the request of Dunlop) a letter containing a memorandum of the transactions, which letter is as follows:

"Clarksville, Tenn., May 3, 1926.

"Mr. Jo P. Dunlop, Clarksville, Tenn.

"Dear Sir: I hereby confirm our transactions of today wherein I and my associates Eustice A. Hail, Joseph A. Boillin, and Leslie Cheek have this day bought through you the following shares of common stock in the Dunlop Milling Company, and under the conditions described.

| | | |
|---|---|---|
| Mrs. Laura Dunlop, | 280 shares $130.00 | $36,400.00 cash |
| Mrs. Laura Dunlop, Tru. | 80 shares $130.00 | 10,400.00 cash |
| H. M. Dunlop | 101 shares $130.00 | 13,130.00 cash |
| Jo P. Dunlop | 544 shares $130.00 | 70,720.00 cash |
| Jo P. Dunlop, Jr. | 1,000 shares $130.00 | 30,000.00 cash |

and balance equal payments, 1, 2, 3 and 4 years with interest from date.

| | | |
|---|---|---|
| Mrs. Allen Brown | 1,000 shares $130.00 | 30,000.00 cash |

and balance 1, 2, 3, and 4 years, with interest from date.

| | | |
|---|---|---|
| Charles Dunlop, | 1,000 shares $130.00 | 35,000.00 cash |

and balance 1, 2, 3, and 4 years, with interest from date.

"Yours very truly,

"[Signed] E. E. Laurent.

"I certify that I am acquainted with the above transaction and that same is in accordance with the above agreement.

"[Signed] L. C. Westenberger."

Thirty days after the directors' meeting above described and the transfer of the Dunlop stock, a meeting of the stockholders of the Dunlop Milling Company was held, and the minutes of that meeting, as they appear on the records of the company, are as follows:

"Stockholders Meeting

"Clarksville, Tenn., June 2, 1926.

"At the regular meeting of stockholders of The Dunlop Milling Company held at the office of the company on Wednesday, June 2, 1926, at 11:00 A. M. in pursuance of the notice given of the Annual Meeting. The following stockholders were represented in person or by proxy in the amount of stock opposite their respective names.

"The notice of the meeting, the same being the copy given each stockholder was then read by Mr. L. C. Westenberger as follows:

" 'The Annual Meeting of the stockholders of The Dunlop Mill-

ing Company will be held on Wednesday, June 2, at the office of the company in Clarksville, Tenn., at 11:00 A. M.

" 'A Proposal will be submitted looking to the amendment of our charter and a change in our capital account and there will also be amendments offered to our by-laws.

" 'If you cannot attend this meeting, we would like for you to send in your proxy and if you have no preference in the matter, you may designate any of the following officers and directors to act for you: W. H. Green, L. C. Westenberger, Jos. A. Boillin, Eustice A. Hail, Leslie Cheek, E. E. Laurent.

" '[Signed] E. E. Laurent, President.'

"The following amendments and by-laws were offered; to strike out Section 3 and insert therefor the following:

"The Board of Directors shall meet on the Second Tuesday in July, October, January and April. The President shall preside at all meetings and shall call a meeting whenever he may deem it necessary, or when requested to do so by any two members of the Board. In his absence, the Board will elect a President pro tem. A majority of the Board shall constitute a quorum for the transaction of business. The meeting of the Board shall be open at all times to the stockholders.

"Amend Section 1 by striking out the words, 'On the First Wednesday of June in each year,' and inserting the words 'Second Tuesday in July of each year.'

"Passed unanimously.

"Mr. Jos. A. Boillin offered the following resolution.

"Resolved that Section 7 of the by-laws and the amendments thereto be amended so as to read as follows: The authorized capital stock of The Dunlop Milling Company shall be $800,000.00 divided into shares of $100.00 each and to consist of 2,000 shares par value preferred stock 7% cumulative callable on any dividend date after five years at $105.00, and 6,000 shares of common stock of which 5,000 shares is to be issued at this time.

"That the 1,000 shares of preferred stock now outstanding be called in and cancelled the holders of the above issue of preferred stock be given in lieu thereof share for share of the new preferred stock here authorized.

"That the Board of Directors of this company should notify the said stockholders to send in their stock immediately for reissue.

"That 5,000 shares of common stock now held by the company in the treasury be cancelled. That the other 1,000 shares of par value preferred stock hereby authorized be offered by the Board of Directors of the company for sale at not less than par. That the Board of Directors of this company are authorized to take such steps as to fully carry out the purpose of this resolution.

"The said resolution was duly seconded and unanimously adopted. The following officers and directors were elected:

"E. E. Laurent, President.

"W. H. Green, Vice-President.

"L. C. Westenberger, Sec'y-Treas.

"Eustice A. Hail
"Leslie Cheek
"Jos. A. Boillin $\left.\right\}$ Directors.
"L. C. Westenberger
"E. E. Laurent

"[Signed] L. C. Westenberger, Sec'y."

The omission from the minutes of the names of the stockholders present in person or by proxy at said stockholders' meeting was a subject of inquiry in proof taking, but it remains unexplained on the record. It was shown that the minutes were kept in a "loose-leaf" book and it would have been possible to remove leaves and substitute others, but there is no evidence that this was done.

In the fall of 1929, the officers and directors of the Dunlop Milling Company realized that its affairs were in a very unsatisfactory condition and, in response to a request, by letter, from defendant Cheek (who represented that he was writing for Boillin also), and representations from Laurent, by telephone, concerning the condition of the company, defendant Jo P. Dunlop went to Clarksville and took charge of the Dunlop Milling Company in the latter part of November, 1929, and remained in charge until the middle of August, 1930, when he relinquished his management of the mill and returned to Asheville.

During this latter period of his management of the Dunlop Milling Company (November, 1929 to August, 1930), defendant Jo P. Dunlop, trading in the name of the Milling Company, speculated "on the market" in grain and stocks, and lost about $75,000, but the Milling Company lost nothing by these transactions, as Jo P. Dunlop restored to the treasury of the Milling Company the entire sum thus lost.

On October 15, 1930 (three days before the original bill in this case was filed), the officers of the Dunlop Milling Company met with representatives of its bank creditors and admitted the inability of the Milling Company to pay its debts, and agreed that it should be promptly liquidated and its assets applied to the payment of its debts.

Pursuant to a call made by the president of the Milling Company, a special meeting of its stockholders was held on October 30, 1930, at which meeting the stockholders, by resolution, adopted recommendations of the officers and directors that the corporation be liquidated, and, further, that its plant, trade-name, and good will be sold to a proposed purchaser at and for the price of $50,000.

On December 23, 1931, E. H. Harrison was, by resolution of the board of directors, appointed as liquidating agent to wind up the affairs of the corporation, and disburse the assets, when liquidated, to the payment, first, of the balance owing the creditors of the corporation; second, to the preferred stockholders; and then to the common stockholders; but this resolution of the board of directors expressly provided that the liquidating agent thereby appointed "is not authorized to participate in any way in any cases against Directors, and/or stockholders, based on ultra vires acts and/or stock transactions, or in any recovery in such cases."

The record tends to show, as the chancellor held, that the debts of the Dunlop Milling Company have all been paid, unless it is indebted to the Louisville & Nashville Railroad Company. It appears that, at the time the proof was taken in 1932, a suit was pending that had been brought by the Louisville & Nashville Railroad Company against the Dunlop Milling Company upon a claim disputed by the Milling Company; but neither the nature nor the amount of this claim is disclosed by the record.

The record also tends to show that the only asset of any value remaining in the hands of the liquidating agent is (or was in September, 1932) a parcel of real estate in the state of Florida which had been acquired by the Milling Company through foreclosure of a mortgage thereon to secure the Milling Company in a debt of "some twenty thousand dollars." The value of this Florida land is not shown. Defendant Laurent describes it as "a good piece of property."

With the foregoing outline of the facts of the large record in this case in mind, we now come to a consideration of the chancellor's findings and decree as challenged by the assignments of error, and in this we will not undertake to follow the order in which the chancellor stated his several findings of fact and law, nor to dispose of the assignments of error of any of the appellants in the order of their assignment.

As all of the parties before this court are appellants, we will continue to designate them, respectively, as complainants and defendants, according to their status on the record below.

1. The chancellor held that "the purchase for the corporation was ultra vires both of the corporation and of the directors."

Defendants Boillin, Laurent, and the Dunlops assert that this holding of the chancellor was erroneous, and defendants Cheek and Hail's administrator say that the chancellor erred in holding that the purchase of this stock by the corporation was "illegal."

On the other hand, it is insisted on behalf of the complainants Uffelman and others (which includes the intervening petitioners), that the holding of the chancellor last above stated is amply sustained by a series of rulings of our Supreme Court.

28

■ Although contrary to the numerical weight of authority in the United States (see case note, 25 L. R. A. (N. S.), page 51), it is the rule in Tennessee that, in the absence of statutory authority, a corporation cannot reduce its authorized capital by purchasing its own shares for cancellation, and such purchase is ultra vires and void. Cartwright v. Dickinson, 88 Tenn., 476, 485, 486, 12 S. W., 1030, 7 L. R. A., 706, 17 Am. St. Rep., 910; Civil Service Investment Association v. Thomas, 138 Tenn., 77, 80, 195 S. W., 775; Herring v. Ruskin Co.-op. Ass'n (Tenn. Ch. App.), 52 S. W., 327, 332; Whaley v. King, 141 Tenn., 1, 3, 206 S. W., 31; Darnell-Love Lumber Co. v. Wiggs, 144 Tenn., 113, 120, 230 S. W., 391; Petre v. Bruce, 157 Tenn., 131, 136, 7 S. W. (2d), 43; Vartanian on The Law of Corporations in Tennessee, section 82, page 169, and section 167, pages 334-335.

■ And if such sale and purchase is executed, the corporation may recover from the seller the sum paid to him by the corporation for the shares (Whaley v. King, supra), or the selling stockholder may rescind the sale and recover the stock upon restoring to the corporation its improperly diverted funds (Darnell-Love Lumber Co. v. Wiggs, supra); thus restoring the parties to their original status. Vartanian, section 93, page 185.

■ However, a corporation may buy shares of its own stock in order to collect a "bad" or "doubtful" debt due it. Unicoi Co. Consumers Co-op. League v. Barnett, 6 Tenn. App., 386. But not with a view of reducing its capital stock, for shares thus bought may be reissued. 1 Cook on Corporations (6 Ed.), section 313, page 854.

"The term ultra vires . . . means any act of a corporation which the corporation is not authorized to do." 2 Cook on Corporations (6 Ed.), section 667, page 1989.

Hence it is not entirely accurate to say that an act which the corporation has the power to do (although it is required that it be done in a certain prescribed manner) is ultra vires if the corporation fails to do it in the statutory way. Alabama Consolidated Coal & Iron Co. v. Baltimore Trust Co. (D. C.), 197 F., 347, 358. For example: "A transaction which the statutes of the state expressly authorize does not become immoral or subversive of the settled policy of the state as those words are here used merely because the officers of a corporation fail to file a certificate in the form required by law." Alabama Consolidated Coal & Iron Co. v. Baltimore Trust Co., supra, 197 F., 347, page 358.

"The distinction is between the entire absence of authority in the organic law itself, and a failure to comply with some prerequisite which the law has made a condition precedent to the exerc's? of corporate functions." Miller v. Insurance Co., 92 Tenn., 167, 183, 21 S. W., 39, 43, 20 L. R. A., 765.

Prior to the enactment of chapter 108 of the Acts of 1915, it was contrary to the declared public policy of the state of Tennessee for a corporation to reduce its authorized capital by purchasing its own shares for cancellation. But public policy is variable; the very reverse of that which is the policy of the public at one time may become public policy at another. Hartford Fire Insurance Co. v. Chicago, etc., R. Co., 175 U. S., 91, 20 S. Ct., 33, 44 L. Ed., 84; Griswold v. I. C. R. Co., 90 Iowa, 265, 57 N. W., 843, 24 L. R. A., 647.

"The legislative department of the state government has exclusive and ample power to determine the state's policy." Cavender v. Hewitt, 145 Tenn. 471, 475, 239 S. W., 767, 768, 22 A. L. R., 755.

In the exercise of this power, the General Assembly of Tennessee passed the Act of 1915, chapter 108 (carried into Shannon's Annotated Code as sections 2031a2-2031a3), which act, including the title, is as follows:

"An Act to permit corporations originally chartered, or hereafter to be chartered, under the laws of the State of Tennessee to amend their charters by reducing the capital stock.

"Section 1. Be it enacted by the General Assembly of the State of Tennessee: That all corporations originally chartered, or hereafter to be chartered, under the laws of the State of Tennessee, shall have and are hereby granted the right to reduce their capital stock. either preferred or common, or both, whenever their stockholders, at a rgular annual meeting, or at any special meeting called for that purpose, vote for such reduction, provided that two-thirds, (2/3) of the outstanding stock of said corporation vote for such reduction; provided further that the relative rights of each stockholder is preserved and the rights of the creditors as against said corporation and its stockholders are not impaired by such reduction.

"Section 2. Be it further enacted: That said amendment shall be obtained by the Board of Directors after the stockholders have voted for such amendment. applying for such amendment as provided in the 'Act to provide for the organization of corporations,' passed March 19th, 1875.

"Section 3. Be it further enacted: That this Act take effect from and after its passage, the public welfare requiring it."

■ The above-quoted statute clearly grants to Tennessee corporations the right to reduce their capital stock upon compliance with the conditions therein prescribed: and when a corporation is authorized to reduce its capital stock. it may do so by purchasing a portion of its own shares and canceling or retiring them. 11 Fletcher's Cyc. of Corporation Law (Perm. Ed.. 1932). section 5148; 14 C. J., page 498, section 737; 1 Cook on Corporations (6 Ed.), section 282.

In the last-cited section of Cook on Corporations, it is said:

"If a corporation has power to reduce its capital stock, it may do

so by purchasing and retiring a portion of its shares. Whether the purchase by a corporation of its own stock will operate to diminish the capital stock is a question of intention. If a reduction is authorized by charter or by statute, and the formalities of making the reduction have been complied with, and the proper corporate authorities purchase for the corporation shares of its own stock and consider the capital stock thereby reduced, the law holds that a reduction of the capital stock is thereby made. But if any of these elements are wanting, then no reduction is effected, and the corporation may at any time sell and re-issue the stock. Hence a mere transfer of stock to the corporation, whether the corporation assumes to buy the stock or the stockholders simply to surrender it, will in no case constitute a reduction, when no formal reduction of the capital stock is made. Even if the stockholder is held to be released by such a transfer, still the stock survives and subsists. The corporation is merely the holder of it, and may sell and re-issue it at any time."

The authorities very generally agree that a reduction of the capital stock of a corporation is "fundamental," and when authorized by statute, such reduction can be effected only in the manner and under the conditions prescribed by the statute, and "a reduction of the capital stock is effected only when all statutory formalities have been complied with." 1 Cook on Corporations (6 Ed.), section 289, page 801, citing Moses v. Ocoee Bank, 1 Lea, 398. See also, 14 C. J., page 498, section 737; 7 R. C. L., p. 56, par. 36: 'Randle v. Winona Coal Co., 206 Ala., 254, 89 So., 790, 19 A. L. R., 118, 130, 131.

In their briefs defendants' counsel have cited chapter 90 of the Acts of 1929 and sections 3735, 3736 of the Code of 1932 as further disclosing the policy of the state of Tennessee to grant to corporations the power to reduce their capital stock by the purchase of their shares for retirement; but these latter statutes were enacted since the transaction complained of in this suit, and, therefore, have no bearing on this case. Hannum v. McInturf, 6 Baxt., 225, 230.

We cannot assent to the contention of able counsel for defendants that the first section of the Act of 1915, chapter 108, may operate (without an amendment of the charter as provided in the second section) to authorize a reduction of the capital stock of a corporation by its purchase of a portion of its shares, which reduction, counsel say, would be binding on every one except the state, provided it was authorized by a two-thirds vote of the stockholders, and preserved the relative rights of each stockholder and the rights of creditors.

When the entire act (chapter 108, Acts 1915), including the title, is taken into view, we think the amendment of the charter

is an essential part of the procedure necessary to legalize the reduction of the capital stock. In states (as in Tennessee) where the Constitution provides that "no bill shall become a law which embraces more than one subject, that subject to be expressed in the title," the title of a statute may be an aid to its interpretation and construction. Black on Interpretation of Laws, section 83, pages 250-252.

In the act here under consideration, the reduction of the capital stock and the amendment of the charter are interdependent; otherwise, they would constitute two different subjects and the act would be unconstitutional.

The rationale of the Act of 1915, as we interpret it, is that, until the amendment is registered the charter operates as a continuing representation on behalf of the corporation that its capital stock as fixed in its charter is unimpaired. Civil Service Investment Association v. Thomas, supra, 138 Tenn., 77, page 81, 195 S. W., 775 · Kom v. Cody Detective Agency, 76 Wash., 540, 136 P., 1155, 50 L. R. A. (N. S.), 1073, 1074, 1075; Hunter v. Garanflo, 246 Mo. 131, 151 S. W., 741, 742. Hence, an attempted reduction of the capital stock of a corporation, under the Act of 1915, chapter 108, is illegal without an amendment of the charter as therein prescribed, but it is not, in a strict technical sense, ultra vires. An ultra vires act of a corporation is void because (as the term implies) of the entire absence of power in the corporation to accomplish it, but an authorized act of a corporation may be illegal and voidable because of a failure to comply with some prerequisite which the law has made a condition precedent to its accomplishment. See authorities cited, supra.

The purchase by the Dunlop Milling Company of 1,005 shares of its capital stock was, in our opinion, illegal and voidable under the rule last stated, but not ultra vires as held by the learned chancellor.

2. If the judgments of the chancery court against Jo P. Dunlop and Laura Dunlop in this case are affirmed, it must be solely upon the theory that they are liable because the purchasers from them used funds of the Milling Company to pay for 1.005 shares of the Dunlop stock, and they (the Dunlops) are chargeable with notice thereof by reason of the fact that they received and accepted checks of the Milling Company for $130,650 representing the purchase price of 1,005 shares at $130 per share; for, if "the stockholder sells to a person, not knowing that the latter is purchasing as trustee for the corporation, the vendor is not liable on such stock." 1 Cook on Corporations (6 Ed.), section 309, page 840; Green v. Ashe, 130 Tenn., 615, 172 S. W., 293; Johnston v. Laflin, 103 U. S. 800, 26 L. Ed. 532.

Jo P. Dunlop contracted (for himself and his family) to sell the

Dunlop Milling Company stock held by the Dunlops to Laurent, Boillin, Hail, and Cheek at an agreed price. At the time the contract was made, all the parties understood that the Dunlops held 4,000 shares of the common stock of said corporation. Without the knowledge of Jo P. Dunlop, the four purchasers named had an agreement among themselves with respect to the manner in which the 4,000 shares were "to be divided and settled for," and it appears from this agreement and the minutes of the directors' meeting of May 3, 1926, in connection with the testimony of the participants in the transaction, that 1,005 shares involved in this litigation were purchased from the Dunlops by Laurent as trustee for himself, Boillin and Hail, and the board of directors bought same for the Dunlop Milling Company from Laurent as such trustee.

When Jo P. Dunlop appeared at the meeting of the board of directors in the office of the Dunlop Milling Company on the morning of May 3, 1926, he was secretary of the company and also a member of its board of directors. and, upon the convening of the board, he tendered his resignation as secretary and as director, which was accepted by the board, and he thereupon withdrew from the meeting and was not present in the room during the further proceedings; but before withdrawing from the directors' room as aforesaid, he delivered to the purchasing "syndicate" (three of whom were certainly at that time present. viz., Laurent, Boillin, and Hail) the certificates for the stock he had sold them, each of which was indorsed by the transferor with the name of the transferee blank. Thereafter, Boillin, Hail. and Cheek were elected directors to fill the places made vacant by the resignations of Jo P. Dunlop, H. M. Dunlop, and John Ward.

The procedure above outlined is significant. The act of Jo P. Dunlop in resigning his membership on the board of directors contemporaneously with his delivery of the stock certificates to the purchasing "syndicate," and the acceptance by Boillin, Hail, and Cheek of membership on the board of directors immediately after Jo P. Dunlop had delivered to them the stock certificates. evidences the understanding of all the parties that the sale and purchase were consummated. and that title to the stock had passed to the purchasers, viz.. Laurent. Boillin, Hail, and Cheek. Johnston v. Laflin, supra; Parker v. Bethel Hotel Co., 96 Tenn., 252, 284, 34 S. W., 209, 31 L. R. A., 706.

Jo P. Dunlop had no actual knowledge or information of the sale of said stock by Laurent, trustee. etc., to the Dunlop Milling Company, and, with respect to the liability or nonliability of Jo P. Dunlop and Laura Dunlop in this case. the determinative question is whether they were chargeable with knowledge that the Milling Company was the ultimate purchaser of, and was paying for, 1,005 shares, by reason of the fact that three checks of the Milling Com-

pany, aggregating $130,650, were included in the "cash payment" received by Jo P. Dunlop.

Jo P. Dunlop testified (without material contradiction) that after he tendered his resignation and delivered the stock certificates as aforesaid, he withdrew from the directors' room and knew nothing further of the proceedings of the directors on that occasion; that in the afternoon of the same day, and after the adjournment of the directors' meeting, defendant Laurent delivered to him all of the checks and notes in settlement for the 4,005 shares of stock, without any information as to how the purchasers had "divided the stock among themselves;" that the included checks of the Dunlop Milling Company were in the usual form and signed by L. C. Westenberger, secretary and treasurer; that when he received said checks of the Milling Company (along with individual checks and notes of the members of the "syndicate"), it "never once entered" his head that the mill itself was buying the stock or that there was anything irregular in the purchasing "syndicate" giving the company's checks.

In explanation of his last-mentioned statement, Mr. Dunlop said, in his testimony, that the men with whom he was dealing (and who had that day acquired control of the Milling Company) were men of great wealth, high character and business experience, in whose character, integrity, financial ability, and business acumen he had "the utmost faith," and, as it had been his own custom for many years theretofore to use the Milling Company as "a kind of a clearing house," he naturally supposed that such men as those above described had made the proper arrangements with the corporation so that the corporation's funds would not be depleted by the issuance of the checks in question.

In view of the foregoing testimony, counsel seek to invoke in behalf of Mr. and Mrs. Dunlop the rule cited in 46 C. J. p. 547, section 37, that: "Where the circumstances relied on as sufficient to charge a party with notice may be equally as well referred to a different matter as to the one with notice of which he is sought to be charged, they will not be deemed sufficient."

The rule just stated was applied in Green v. Ashe, 130 Tenn.. 615, 172 S. W., 293, in favor of Ashe. who was sued by the receiver of an insolvent bank to obtain restitution of a sum of money received by Ashe out of the bank's funds for the purchase price of stock in the same bank, which stock Ashe had sold to the president of the bank without knowledge on the part of Ashe that the president was in fact buying the stock for the bank.

It was insisted for the receiver that Ashe was chargeable with knowledge that the purchase money was furnished by the bank and that the shares were covered into its treasury, by reason of the fact that the bank gave Ashe credit for the proceeds of sale and

issued to him a duplicate deposit slip and Ashe checked the deposit out of the bank. But the Supreme Court declined to so hold, and (reversing the decree of the chancery court) decreed that Ashe was not liable for the sum thus unlawfully diverted from the funds of the bank by its president.

It is insisted that the holding in Green v. Ashe, supra, is directly in point here and is conclusive authority for nonliability of the Dunlops. In this connection, it is said in the able brief for the Dunlops, that:

"All the check imported was that the company was for the minute permitting the use of its funds as part payment. How that was arranged for, whether the company received checks back or whether it loaned the money, or whether the company had already collected the money was not in the least disclosed. The only thing disclosed was the company's check was used by men of enormous financial responsibility and splendid financial reputation. They were men whose financial standing could not have been questioned This check, therefore, was no more than knowledge that somehow the company's check was being used by these men. It certainly is no more notice than was the fact in the Green v. Ashe Case that the seller was credited on the books of the bank whose stock was being sold with the purchase price. No distinction can be drawn, it is submitted, between receiving the credit on the books of the corporation whose stock is sold and receiving the check of the corporation whose stock is sold, except to strengthen the likelihood of the corporation buying when a credit is received on its book without check."

Counsel then undertake to distinguish the instant case from certain Tennessee cases holding that, where the check of a corporation is received in payment of the individual obligation of the corporate officer signing the check, the payee of the check is put on notice to look into the authority of the officer who signed the check (citing Pemiscot County Bank v. Central State National Bank. 132 Tenn.. 152, 177 S. W., 74, and Pemiscot County Bank v. Wilson-Ward Co., 135 Tenn., 426, 186 S. W., 598).

In the case of Hill & Co. v. Church, 17 Tenn. App., 603, 69 S. W. (2d), 612, it was pointed out that the Pemiscot County Bank Cases, supra, involved drafts drawn by the cashier of a bank and that the powers of bank cashiers are much greater than those of the treasurer of an ordinary corporation (such as a trading or manufacturing corporation), and that an officer of a corporation of the latter class has no authority to pay his private debts out of corporate funds.

In Hill & Co. v. Church, supra, it was held. in substance, that one who receives the check of a corporation for the personal benefit of its officer is put on inquiry as to the officer's right to appropriate

the funds of the corporation to his own use, and, if he fails to make such inquiry and the check operates as an unlawful diversion of the corporate funds, he is liable to the corporation for any loss it sustains thereby.

The above-stated ruling in Hill & Co. v. Church, supra, was an application to particular facts of the general rule of equity jurisprudence that: "Whenever a party has information or knowledge of certain extraneous facts, which of themselves do not amount to, nor tend to show, an actual notice, but which are sufficient to put a reasonably prudent man upon an inquiry respecting a conflicting interest, claim, or right, and the circumstances are such that the inquiry, if made and followed up with reasonable care and diligence, would lead to a discovery of the truth, to a knowledge of the interest, claim, or right which really exists, then the party is absolutely charged with a constructive notice of such interest, claim, or right. The presumption of knowledge is then conclusive." 2 Pom. Eq. Juris. (4 Ed.), section 608, page 1154.

 We do not think that under the rule upon which the Dunlops rely (46 C. J., p. 547, sec. 37, supra), Jo P. Dunlop was justified in referring the use of the Milling Company's funds in part payment for the stock to his previous practice of using the company's funds to pay the personal and individual debts of himself and members of his family, which practice was irregular and improper, in fact, unlawful. Nor do we think that the great wealth and excellent reputation in the world of finance of the men to whom he had sold the stock was sufficient to relieve him of the consequences of the notice conveyed by the use of the company's checks. The financial responsibility and reputation of a corporate officer cannot properly be made the test of his right to use the funds of the corporation to pay his personal debts.

In Green v. Ashe, supra, the credit to Ashe's account on the books of the bank was given "on Ashe's request" (130 Tenn. 615, opinion page 619, 172 S. W., 293, 294), and, as Gass (whom Ashe believed to be the real purchaser) "was, as president, active in the bank's banking house in the conduct of its current affairs" and Ashe had a deposit account at that bank, it was quite natural that Ashe would, in order to avoid circuity in the method of payment and incidental trouble to himself, anticipate the settlement by requesting that his account at the bank be credited with the purchase price of the stock. (He having in mind that Gass would himself provide the funds and cause proper entries to be made on the bank's books.)

 It seems to be assumed (and properly so) by all parties that Mrs. Laura Dunlop is, upon the record facts, bound by the knowledge of, or notice to, Jo P. Dunlop, who was admittedly her agent in the transaction.

 We are of the opinion that by reason of their acceptance

of checks of the Milling Company in payment for the stock sold by them to Laurent, Boillin, and Hail, Jo P. and Laura Dunlop were chargeable with notice of the unlawful diversion of the funds of the Dunlop Milling Company, and are liable to judgment therefor, but with the limitations decreed by the chancellor, and with the further limitation that their liability is secondary to that of Laurent, Boillin, and Hail's administrator.

3. As already indicated, we find that the Dunlops sold 4,005 shares of common stock in the Milling Company to Laurent, Boillin, Hail, and Cheek, and title passed from the Dunlops to the aforesaid purchasers when Jo P. Dunlop delivered the stock certificates to the purchasers at the time and in the manner before stated. Parker v. Bethel Hotel Company, supra; Johnston v. Laflin, supra; Vartanian, section 228, page 460, and section 230, page 462.

As between the sellers and purchasers, nothing remained to be done except for the purchasers to pay the sellers for the stock. Johnston v. Laflin, supra. But the purchasers had an agreement among themselves as to the manner in which they would divide and pay for the stock. It is a reasonable inference from the proof, and we find, that when the purchasers discovered that the Dunlop certificates aggregated 4,005 shares (instead of 4,000, as they had previously supposed), they added 5 shares to the 1,000 shares which it was agreed that Laurent should purchase as trustee for himself, Boillin, and Hail. Hence, it resulted that (in addition to the shares which each had individually agreed to buy) Laurent, Boillin, and Hail bought from the Dunlops 1,005 shares and sold same to the Dunlop Milling Company; but instead of paying for the 1,005 shares with their own funds and collecting the purchase price from the Milling Company, they procured the issuance direct to Jo P. Dunlop of checks of the Milling Company for the agreed purchase price of the 1,005 shares, viz., $130,650.

 In thus, as directors, buying for the corporation from themselves as individuals, 1,005 shares of the Milling Company's stock, Laurent, Boillin, and Hail violated a settled principle of equity jurisprudence that one cannot unite the two opposite characters of buyer and seller. "Especially is this the rule with corporate directors." 2 Cook on Corporations (6 Ed.), section 652, page 1896.

With reference to the rule just stated, in Michoud v. Girod, 4 How. 503, 555, 11 L. Ed., 1076, 1099, it is said:

"The general rule stands upon our great moral obligation to refrain from placing ourselves in relations which ordinarily excite a conflict between self-interest and integrity. It restrains all agents, public and private; but the value of the prohibition is most felt, and its application is more frequent, in the private relations in which the vendor and purchaser may stand towards each other.

The disability to purchase is a consequence of that relation between them which imposes on the one a duty to protect the interest of the other, from the faithful discharge of which duty his own personal interest may withdraw him. In this conflict of interest, the law wisely interposes. It acts not on the possibility, that, in some cases, the sense of that duty may prevail over the motives of self-interest, but it provides against the probability in many cases, and the danger in all cases, that the dictates of self-interest will exercise a predominant influence, and supersede that of duty. It therefore prohibits a party from purchasing on his own account that which his duty or trust requires him to sell on account of another, and from purchasing on account of another that which he sells on his own account. In effect, he is not allowed to unite the two opposite characters of buyer and seller, because his interests, when he is the seller or buyer on his own account, are directly conflicting with those of the person on whose account he buys or sells.''

■ For the reason that Laurent, Boillin, and Hail could not, as directors, lawfully buy Dunlop Milling Company stock from themselves as individuals, we are of the opinion that the complainants (for the use of the Dunlop Milling Company) are entitled to a decree against them for the purchase price of the shares sold by them to the corporation, to the extent and with the limitations stated in paragraphs (b) and (f) of the chancellor's decree, supra.

4. Defendant Cheek did not sell any stock to the Dunlop Milling Company, and he had no personal interest in the stock that was sold to it by Laurent, Boillin, and Hail. If this suit is maintained against him, it must be solely upon the ground that, as a director of the Dunlop Milling Company, he approved the resolution adopted by the board of directors on May 3, 1926, which purported to authorize the purchase by the corporation of the stock in controversy from E. E. Laurent, trustee, for the purpose of cancellation and retirement thereof.

Defendant Cheek did not personally participate in the negotiations with Jo P. Dunlop for the purchase of the Milling Company stock. He and Hail lived at Nashville and were intimate friends. Upon representations of Hail that the investment would be a desirable one, he agreed with Hail that if the stock could be bought within a specified price range, he would take 500 shares. He later signed the aforesaid written agreement of April 26, 1926, between Laurent, Boillin, Hail, and himself, providing for the manner in which the Dunlop stock should be "divided and settled for," which agreement contained a provision that "Leslie Cheek and Eustice Hail, jointly are to receive and settle for 1000 shares." Said agreement contained the further provision that, "It is agreed and understood that the 1,000 shares herein subscribed for by E. E. Laurent, as trustee for himself, Jos. A. Boillin and Eustice A. Hail shall be

surrendered to Company for cancellation,'' but this was expressly coupled with the condition that it should be done ''if and when the directors and shareholders of the Dunlop Milling Company shall so request in writing at same price herein mentioned.''

Defendant Cheek was late in arriving at the meeting of the board of directors on May 3, 1926, and he was elected a director and the resolution with respect to the purchase by the company of 1,000 shares of its common capital stock from E. E. Laurent, trustee, was adopted by the board of directors before Cheek's arrival, but he states in his testimony that upon his arrival he was informed of all that had been done, as shown by the minutes, and that he approved it. His status with respect to the proceedings of the board of directors on that occasion is, therefore, the same as if he had been present and voting throughout the meeting as stated in the minutes which have been hereinbefore copied.

The record shows, by undisputed proof, that a brother of defendant E. E. Laurent, Mr. Jos. S. Laurent, a reputable lawyer of Louisville, Ky. (who had been a practicing lawyer since 1910, first for three years in Nashville, Tenn., and since that time in Louisville, Ky., and whose ''practice is largely corporation practice''), was present throughout the aforesaid meeting of the directors on May 3, 1926, at the request of defendant E. E. Laurent, for the purpose of advising the directors with respect to the legality of their proceedings; that before he came to Clarksville on that occasion, he had been furnished a copy of the aforesaid agreement of April 26, 1926, which disclosed the agreement and understanding of the members of the purchasing ''syndicate'' with reference to the proposed surrender to the Milling Company for cancellation of 1,000 shares of its stock; that after his arrival in Clarksville on May 3, 1926, and before the meeting of the directors, he consulted Mr. Will Daniel, a reputable lawyer of Clarksville, with reference to the power of the corporation to purchase said 1,000 shares for cancellation in conformity with the proposed plan, and was advised by Mr. Daniel that such purchase would be lawful in Tennessee; that he (Jos. S. Laurent) was present during the meeting of the directors and advised them that they could lawfully do all the things done by them during that meeting as shown by the minutes, and that, at the close of the meeting, he prepared the minutes thereof (by dictating them to a stenographer in the directors' room), which minutes were then verified by the signatures of the president and secretary as they appear herein, supra.

There is some diversity of opinion among the courts of the several states with respect to the relation of corporate directors to the corporation and its shareholders and as to the liability of directors for their acts as such in particular circumstances. We will, therefore, confine ourselves to what we understand to be the rules on

this subject established by the holdings of our Supreme Court and cases from other jurisdictions which have been expressly approved by our Supreme Court.

In Deaderick v. Wilson, 8 Baxt., 108, 114, the court approved the opinion in Spering's Appeal, 71 Pa., 11, 10 Am. Rep., 684, with respect to the relation of directors to the corporation and its shareholders, and held that directors are not "technical trustees" and should not be held "for mistakes of judgment;" but the Court said (in 8 Baxt. 108, 115):

"They are agents charged with the performance with fidelity of the duties that grow out of their position, as defined by the powers, objects and purposes of the charter of the company. To this extent is their position fiduciary, and for breaches of good faith in the performance of these trusts they are held responsible. These general propositions, though sound in our judgment, may, in their application to particular cases require some qualifications; but, as general propositions, we think they embody the true idea on which the responsibility of such parties rest, as deducible from the cases and the nature of the positions themselves."

In Vance v. Phoenix Insurance Company, 4 Lea, 385, 389, it was held that "directors who act in good faith, and with reasonable care and diligence, but nevertheless fall into a mistake, either as to law or fact, are not liable for the consequences of such mistake." See, also, Shea v. Mabry, 1 Lea, 319, 343; Wallace v. Lincoln Savings Bank, 89 Tenn., 630, 652-654, 15 S. W., 448, 24 Am. St. Rep., 625; Hunt v. Gaslight Co., 95 Tenn., 136, 147, 31 S. W., 1006; Tradesman Publishing Co. v. Car Wheel Co., 95 Tenn., 634, 665, 32 S. W., 1097, 31 L. R. A., 593, 49 Am. St. Rep., 943; Deaderick v. Bank, 100 Tenn., 457, 462, 45 S. W., 786; Green v. Officers & Directors of Trust Co., 133 Tenn., 609, 626, 182 S. W., 244; Jones v. First State Bank, 158 Tenn., 356, 363, 13 S. W. (2d), 326.

It is unquestioned on the record that defendant Cheek was a competent and experienced business man, and we find that, with respect to the subject-matter of this litigation, he acted in good faith and for what he deemed to be for the best interest of all the stockholders of the Dunlop Milling Company. It also appears, as heretofore stated, that he acted upon the advice of a reputable and experienced lawyer. In Vance v. Phoenix Insurance Co., supra (4 Lea, page 391), the court said:

"There is, therefore, clearly no ground for holding the defendants liable, unless it be for failing to take legal advice. But the very fact that a mistake of law will not, of itself, create liability, necessarily implies that such a mistake may be committed without legal advice. Some of the cases do hold that acting under legal advice may tend to protect against liability, while none of them decide that its absence ensures liability. Ordinarily, the advice of

counsel will not protect a trustee: Perry on Trusts, section 927. Nor shield any person from the consequences of a wrongful or illegal act: Kendrick v. Cypert, 10 Humph., 291. The true rule in this class of cases is, that if the Directors feel any doubts as to the law, they may be guilty of neglect if they fail to seek and be guided by competent legal advice, and this for the obvious reason that they would, under like circumstances, seek such advice in the management of their private affairs.''

Complainants insist that defendants cannot rely upon ''legal advice'' in the instant case, for the reason that they did not plead it. It is true that the defendants did not plead ''legal advice'' in haec verba, but they allege in their answer that they acted in good faith and for what they deemed to be for the interest and benefit of all the shareholders; and the fact that they acted upon ''legal advice'' was competent as tending to show their ''good faith.'' Vance v. Phoenix Insurance Co., supra.

It should be borne in mind that, at the time of the action of the directors on May 3, 1926, the Dunlop Milling Company was in a highly prosperous condition, and there was no apparent reason for the directors to anticipate the financial reverses which befell it upon the advent of the general economic collapse in 1929, which, as the record shows, resulted disastrously to many of the larger mills of the country, as well as to practically every other line of business. The conduct of the directors is to be viewed in the light of the financial status of the corporation in May, 1926, and ''is not to be determined by its ultimate insolvency, precipitated, doubtless, by the universal paralysis of business then prevailing throughout this country.'' Tradesman Publishing Co. v. Car Wheel Co., supra, 95 Tenn., 634, page 665, 32 S. W., 1097, 1105, 31 L. R. A., 593, 49 Am. St. Rep., 943. We find no sufficient basis in the record for a judgment against defendant Cheek, and the judgment of the chancery court against him will be reversed, and as to him the bill will be dismissed.

5. The chancellor found that ''all of the creditors of the corporation have been paid in full; that any recovery herein will be for the benefit of stockholders;'' and this finding is not assigned as error; hence we are dealing only with questions relating to the claims of stockholders against the defendants.

The chancellor was of the opinion that there should be no recovery herein for the benefit (a) of any stockholder who participated in the transaction; nor (b) for the benefit of any stockholder who, for any appreciable length of time before a receiver for the corporation was appointed, knew of the transaction; nor (c) for the benefit of any shareholder who, subsequent to the transaction complained of, purchased his shares from one who had knowledge of the transaction; and, further, that the recovery for the benefit

of each stockholder (not excluded as aforesaid) should be proportionate, that is, in the ratio of the number of his shares to the whole number of shares; the "whole number of shares" being 1,000 shares of preferred stock and 5,960 shares of common stock, and the preferred stock having priority over the common stock; and he so decreed.

The complainants assert, through assignments of error, that the portions of the chancellor's opinion and decree just stated in the next preceding paragraph are erroneous, and that the chancellor should have rendered judgment in favor of the complainants, for the use and benefit of the Dunlop Milling Company, for the full sum of $130,650, with interest thereon from May 3, 1926, and should not have excluded any shareholders.

Parenthetically, we will state here that the chancellor's decree directs that interest be allowed upon the recovery from May 2, 1926. This is, we assume, either a clerical error of the typist or an inadvertent error of the chancellor, as obviously the true date from which interest should be computed is May 3, 1926, and the decree will be corrected accordingly.

"A stockholder may by participation, consent, acquiescence or laches be estopped to question the validity of a reduction of capital stock." 14 C. J., p. 504, section 746. Accordant: Cook on Corporations (6 Ed.), sections 646, 647, page 1855; Id., vol. 3. sections 728-733; 7 R. C. L., p. 321. par. 297; Hill v. Atl. & N. C. Railroad Co., 143 N. C., 539, 55 S. E., 854, 9 L. R. A. (N. S.), 606, 616-618; Vartanian on The Law of Corporations in Tennessee, section 249, p. 507, and section 254. pp. 515-518.

The principle stated in the above quotation from 14 C. J., p. 504. was applied in the case of McCampbell v. Railroad Co., 111 Tenn., 55, 69, 77 S. W., 1070. 102 Am. St. Rep., 731, although that case did not involve a reduction of capital stock.

In 3 Cook on Stockholders (6 Ed.), it is said:

"When a stockholder brings an action to remedy the frauds, ultra vires acts, or negligence of a director or third person, the most common and dangerous defense that he has to encounter is the defense that he has been guilty of laches in bringing his action." Section 728

"Laches is a defense only when the stockholder, with a full knowledge of the facts has delayed an unreasonable length of time in bringing his action. These two elements, knowledge and delay, are the essential elements of the defense. Until the stockholder has full and complete knowledge of all the essential facts which would be likely to induce him to institute the action, the beginning of the time from which laches will run cannot be said to commence." Section 731, p. 2395.

"After a stockholder has knowledge of or is chargeable with knowledge of an ultra vires, fraudulent, or negligent act of the

directors, he must institute his suit, if at all, within a reasonable time thereafter. As to what will constitute a reasonable time depends on the circumstances of the case. The length of time during which a stockholder may delay in bringing his suit varies with each case, according to the circumstances of that case. The court requires that reasonable promptness be exercised so that large investments of new money or changes in the ownership of the stock or property may not be prevented or jeopardized by an unreasonable delay on the part of a stockholder in objecting to the transaction." Section 732, pp. 2398-2399.

"A stockholder who has been guilty of laches cannot base his suit on the objections of other stockholders who were not guilty of laches." Section 733, p. 2409.

"If it is evident that the stockholder waited to see whether the unauthorized act would be profitable to the corporation, the court will refuse to grant him any relief. So also, if the stockholder, after a full knowledge of the facts, stands by and allows large operations to be completed, or money expended, or alterations to be made before he brings suit, he is guilty of laches, and his remedy is barred." Section 733, p. 2411.

In the instant case, the defendants are themselves large stockholders in the Dunlop Milling Company, and it seems clear to us that the court should not collect money from them to be immediately returned to them.

This suit was not brought until the lapse of about four and one-half years after the action of the directors of which complaint is made herein. For the first three years of that period, the Dunlop Milling Company was in a prosperous condition and paid dividends regularly to its stockholders. We do not think that stockholders who knew of the transaction could wait to see whether the unauthorized act of which they now complain would be profitable to the corporation, and then maintain a suit for recovery of their proportionate part of the sum illegally diverted from the treasury of the corporation. 2 Cook on Corporations (6 Ed.), section 733, p. 2411, supra.

A purchaser of shares in a corporation acquires no greater rights than his vendor, and if his vendor had with knowledge, acquiesced in a violation of corporate rights, he (the purchaser) cannot complain. McCampbell v. Railroad Co , supra, 111 Tenn., 55, page 75, 77 S. W., 1070, 102 Am. St. Rep., 731; 7 R. C. L., p. 489, par. 470; 14 C. J., p. 504, section 746.

We find no error in that part of the chancellor's decree whereby he excluded from a recovery in this case (a) any stockholder who participated in the transaction complained of; (b) any stockholder who, for any appreciable length of time before a receiver (liquidator) for the corporation was appointed, knew of the

transaction; and (c) any stockholder who, subsequent to the transaction, purchased his shares from one who had knowledge thereof; nor in that part of his decree which directs that the recovery for the benefit of each shareholder (except those excluded as aforesaid) should be proportionate, that is, in the ratio of the number of his shares to the whole number of shares, which whole number must include the 1,005 shares.

6. The chancellor's "findings" are, by his decree, "made the judgment of the court," and one of these findings is that "complainants are entitled to recover, in addition to their proportionate shares, for counsel fees." This is, as we interpret it, an adjudication that the complainants are entitled to recover from the defendants a sum as fees for complainants' counsel, in addition to the recovery for their proportionate shares of stock.

We are not aware of any rule recognized in this state, either by courts of law or equity, which would support the allowance of such additional counsel fees in a case of this character. "It is, of course, well settled that a litigant ordinarily cannot collect his attorney's fees from his adversary, however wrongful may have been the suit, or however groundless the defense. . . . 'The law awards to the successful party his taxable costs, but the fees which he pays to counsel are not taken into consideration.' " Corinth Bank & Trust Co. v. Security National Bank, 148 Tenn., 136. 154, 252 S. W., 1001, 1006.

The counsel for complainants should be paid reasonable compensation for the valuable services rendered by them in this litigation, but such compensation will be paid out of the aggregate recovery; all intervening petitioners who may recover contributing pro rata thereto. Moses v. Ocoee Bank, 1 Lea, 398, 414; Grant v. Lookout Mountain Co., 93 Tenn., 691, 700, 28 S. W., 90, 27 L. R. A., 98.

However, the inclusion of the matter of counsel fees in the reference heretofore ordered by the chancellor would have been premature, as it will be impracticable to fix the proper amount of such fees until the execution of the pending order of reference and the action of the chancery court on the master's report to be made pursuant thereto; hence it was proprly omitted from the reference ordered.

7. It results that the decree of the chancery court adverse to defendant Cheek will be reversed and as to him the suit will be dismissed, and otherwise the decree will be modified in the respects indicated in this opinion, and, as thus modified, it will be affirmed, and the cause will be remanded to the chancery court of Montgomery county for the execution of the reference and for such further orders and decrees. in conformity with the opinion and decree of this court, as may be necessary and proper in the premises.

The costs incident to making the defendant Leslie Cheek a party and prosecuting this suit against him in the chancery court and one-tenth of the costs of the appeal will be adjudged against the complainants (including the intervening petitioners) and the surety on their appeal bond.

The remainder of the costs of the appeal will be adjudged primarily against the defendants Laurent, Boillin, and Nashville Trust Company, administrator, etc., of Eustice Hail, deceased, and the sureties on their appeal bond, and secondarily against defendants Jo P. Dunlop and Mrs. Laura Dunlop and the surety on their appeal bond.

Crownover and DeWitt, JJ., concur.